# EXH A

ORIGINAL

**IN THE COURT OF COMMON PLEAS**
**HAMILTON COUNTY, OHIO**
**CIVIL DIVISION**

GAYLE BACHMAN
5247 MADISON PIKE
INDEPENDENCE, KY 41051

And

CINDY BARTLETT
5247 MADISON PIKE
INDEPENDENCE, KY 41051

And

JOSEPH BAUMGARDNER
5247 MADISON PIKE
INDEPENDENCE, KY 41051

And

TROY BECKELHEIMER
5247 MADISON PIKE
INDEPENDENCE, KY 41051

And

SHAWNDA BENTON
5247 MADISON PIKE
INDEPENDENCE, KY 41051

And

LEONA BEYER
5247 MADISON PIKE
INDEPENDENCE, KY 41051

And

MICHAEL BROPHY
5247 MADISON PIKE
INDEPENDENCE, KY 41051

And

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

CASE NO.  A 1 6 0 1 2 3 7

**COMPLAINT AND**
**JURY DEMAND**



D113694542 INI

**(ALL NEW DR. DURRANI CASES**
**SHALL GO TO JUDGE RUEHLMAN**
**PER HIS ORDER)**



1

**ANDREW CARR**                :
**5247 MADISON PIKE**          :
**INDEPENDENCE, KY 41051**     :
                              :
And                           :
                              :
**DAVID CONGER**               :
**5247 MADISON PIKE**          :
**INDEPENDENCE, KY 41051**     :
                              :
And                           :
                              :
**KAREN CRISSINGER**           :
**5247 MADISON PIKE**          :
**INDEPENDENCE, KY 41051**     :
                              :
And                           :
                              :
**JOY CULLINS**                :
**5247 MADISON PIKE**          :
**INDEPENDENCE, KY 41051**     :
                              :
And                           :
                              :
**MARGARET DAILEY**            :
**5247 MADISON PIKE**          :
**INDEPENDENCE, KY 41051**     :
                              :
And                           :
                              :
**CHRISTINA GOLDSTEIN**        :
**5247 MADISON PIKE**          :
**INDEPENDENCE, KY 41051**     :
                              :
And                           :
                              :
**CARLA GRIESSMAN**            :
**5247 MADISON PIKE**          :
**INDEPENDENCE, KY 41051**     :
                              :
And                           :
                              :
**KATHY JILL HERSLEY**         :
**5247 MADISON PIKE**          :
**INDEPENDENCE, KY 41051**     :
                              :

2

And                                           :
                                              :
KEVIN HUNLEY                                  :
5247 MADISON PIKE                             :
INDEPENDENCE, KY 41051                        :
                                              :
And                                           :
                                              :
GEORGE HUTCHINSON                             :
5247 MADISON PIKE                             :
INDEPENDENCE, KY 41051                        :
                                              :
And                                           :
                                              :
MARTHA HUTTON                                 :
5247 MADISON PIKE                             :
INDEPENDENCE, KY 41051                        :
                                              :
And                                           :
                                              :
SARA JONAS                                    :
5247 MADISON PIKE                             :
INDEPENDENCE, KY 41051                        :
                                              :
And                                           :
                                              :
DEBORAH KIDD                                  :
5247 MADISON PIKE                             :
INDEPENDENCE, KY 41051                        :
                                              :
And                                           :
                                              :
MAGGIE KNAUER                                 :
5247 MADISON PIKE                             :
INDEPENDENCE, KY 41051                        :
                                              :
And                                           :
                                              :
ROSE KOEHLER                                  :
5247 MADISON PIKE                             :
INDEPENDENCE, KY 41051                        :
                                              :
And                                           :
                                              :
SHANNON KOEHLER                               :
5247 MADISON PIKE                             :

3

INDEPENDENCE, KY 41051      :

                                      :

And                               :

                                      :

PATRICIA LEGENDRE      :
5247 MADISON PIKE      :
INDEPENDENCE, KY 41051      :

                                      :

And                               :

                                      :

DEREK LIST      :
5247 MADISON PIKE      :
INDEPENDENCE, KY 41051      :

                                      :

And                               :

                                      :

TONIA MCQUEARY      :
5247 MADISON PIKE      :
INDEPENDENCE, KY 41051      :

                                      :

And                               :

                                      :

RAHMANN NISBETT      :
5247 MADISON PIKE      :
INDEPENDENCE, KY 41051      :

                                      :

And                               :

                                      :

SUSAN SCHOCK      :
5247 MADISON PIKE      :
INDEPENDENCE, KY 41051      :

                                      :

And                               :

                                      :

SHERRY SPANGENBERG      :
5247 MADISON PIKE      :
INDEPENDENCE, KY 41051      :

                                      :

And                               :

                                      :

BILLY SPIVY      :
5247 MADISON PIKE      :
INDEPENDENCE, KY 41051      :

                                      :

And                               :

                                      :

CONNIE UNDERWOOD     :
5247 MADISON PIKE     :
INDEPENDENCE, KY 41051   :
               :
And            :
               :
TRACEY WALSH       :
5247 MADISON PIKE     :
INDEPENDENCE, KY 41051   :
               :
And            :
               :
TAMATHY WILDER      :
5247 MADISON PIKE     :
INDEPENDENCE, KY 41051   :
               :
And            :
               :
WILLIAM WOLDER      :
5247 MADISON PIKE     :
INDEPENDENCE, KY 41051   :
               :
And            :
               :
EVELYN YOUNG       :
5247 MADISON PIKE     :
INDEPENDENCE, KY 41051   :
               :
And            :
               :
JUDY YOUNG        :
5247 MADISON PIKE     :
INDEPENDENCE, KY 41051   :
               :
    Plaintiffs,     :
v.             :
               :
CINCINNATI CHILDREN'S   :
HOSPITAL MEDICAL CENTER  :
333 Burnette Ave.       :
Cincinnati, Ohio 45229     :
  SERVE: Frank C. Woodside, III :
  1900 Chemed Center   REGULAR MAIL WAIVER
  255 E. Fifth Street     :
  Cincinnati, Ohio 45202   :

**(Serve via Certified mail)**        :

                                           :

**And**                                     :

                                           :

**THE CHRIST HOSPITAL, INC.**       :
2139 Auburn Avenue                           :
Cincinnati, Ohio 45219                      :
Serve:CT Corporation System
1300 East Ninth Street      REGULAR MAIL WAIVER
Cleveland, Ohio 44114                      :

                     **Defendant.**

## PARTIES, JURISDICTION AND VENUE

Comes now, Plaintiffs, by and through counsel, and for this Complaint states as follows:

1.      Plaintiffs are patients of Dr. Atiq Durrani who had surgery by Dr. Durrani at Christ Hospital during the time Dr. Atiq Durrani was employed at Children's Hospital.

2.      Plaintiffs each have a filed claim against Christ Hospital or formerly a filed claim which was 41(a) dismissal but will be re-filed against Christ Hospital.

3.      Dr. Durrani treated the Plaintiffs while he was an employee of Children's Hospital. Therefore, Children's Hospital is liable for any negligence or conduct giving rise to claims by the conduct of Dr. Durrani.

4.      At all times relevant herein, Christ hospital held itself out to the public, and specifically to Plaintiff, as a hospital providing competent and qualified medical and nursing services, care and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

5.      At all times relevant, Cincinnati Children's Hospital Medical Center (hereinafter "Children's Hospital"), was authorized to transact business and perform medical services in the State of Ohio and operate under the trade name Children's Hospital Medical Center.

6

6.  At all times relevant herein, Children's Hospital held itself out to the public, and specifically to Plaintiff, as a hospital providing competent and qualified medical and nursing services, care and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

7.  Plaintiffs will consolidate these claims with the other claims filed by these Plaintiffs after they are filed.

8.  This case has been previously dismissed pursuant to Civ. R. 41(A)(1)(a) and is now being refiled within the time allowed by O.R.C. 2305.19.

**Gayle Bachmann**
**2239 Mossy Grove**
**Hamilton, OH 45013**

9.  Ms. Bachman was experiencing pain in her lower back when she was referred to Dr. Durrani at his Deaconess Hospital office in April 2008.

10.  During her consultations with Dr. Durrani, he immediately recommended that Ms. Bachman undergo surgery for damaged sciatic nerves.

11.  In July 2008, Dr. Durrani performed a lumbar area surgery on Ms. Bachman at Christ Hospital.

12.  Following this first surgery, Ms. Bachman continued to treat with Dr. Durrani.

13.  Once CAST opened, Ms. Bachman saw Dr. Durrani at his CAST offices.

14.  Ms. Bachman was continuing to experience pain and Dr. Durrani recommended another surgery.

15.  In August 2009, Dr. Durrani performed a laminectomy and decompression from T12-L2 and attempted a spine fusion at those levels at Christ Hospital.

16.  Following this surgery, Ms. Bachman continued to treat with Dr. Durrani and CAST.

7

17.     As Ms. Bachman continued her care, it was noted by Dr. Durrani that she had loose screws at the S1 area as well as a fractured T10 vertebrae.

18.     In September 2010, Dr. Durrani performed a revision surgery on Ms. Bachman in the areas from L4 though S1 to again attempt a fusion of her spine in that area at West Chester Hospital.

19.     It appears from medical records that Dr. Durrani also attempted fusion from T2 or T3 all the way through S1 during the September 2010 surgery.

20.     Following this surgery, Ms. Bachman continued her care with Dr. Durrani and CAST.

21.     In September 2011, Dr. Durrani attempted another surgery on Ms. Bachman, this time a cervical fusion from C3 through C7 at West Chester Hospital.

22.     Following this surgery, Ms. Bachman continued her care with Dr. Durrani and CAST.

23.     In June 2011, Dr. Durrani attempted another surgery on Ms. Bachman, this time an L5-S1 foraminotomy and decompression at West Chester Hospital.

24.     Following this surgery, Ms. Bachman continued her care with Dr. Durrani and CAST.

25.     In February 2012, Dr. Durrani attempted another surgery on Ms. Bachman, this time a re-instrumentation from T3 through T6 at West Chester Hospital.

26.     In March 2012, Dr. Durrani performed another surgery on Ms. Bachman, an irrigation and debridement of her wounds from her recent surgery at West Chester Hsopital.

27.     In December 2012, Dr. Durrani performed another surgery on Ms. Bachman, another attempted L5-S1 fusion at West Chester Hospital.

28.     Following her December 2012 surgery, Ms. Bachman continued her care with Dr. Durrani and CAST through Summer 2013.

29.     It is believed that Ms. Bachman had approximately eleven surgeries, some or all

8

performed by Dr. Durrani from 2008 through 2013.

30.     Upon information and belief, Dr. Durrani used Infuse/Bmp-2 "off-label" without Ms.

Bachman's knowledge or consent in one or more of Ms. Bachman's surgeries, causing harm.

31.     Upon information and belief, Dr. Durrani used Puregen, a product not FDA approved for

use in humans without Ms. Bachman's knowledge or consent in one or more of Ms. Bachman's

surgeries, causing harm.

32.     Ms. Bachman now experiences new, different and worse pain than she did prior to her

treatment with Dr. Durrani and CAST.

33.     Upon information and belief, the surgeries performed by Dr. Durrani were medically

unnecessary and/or improperly performed.

**Cindy Bartlett**
**4652 Catalpa Court**
**Fort Wright, KY 41017**

34.     In 2005, Plaintiff Cindy Bartlett was referred to Dr. Durrani by a physical therapist for

back pain.

35.     On the first visit, Dr. Durrani told Plaintiff she needed immediate spinal fusion surgery to

get rid of any pain in her back.

36.     On or about January 28, 2006 Dr. Durrani performed a spinal fusion surgery on Plaintiff

at Christ Hospital.

37.     Upon information and belief, Dr. Durrani used Infuse/BMP-2 or Puregen "off-label"

without Plaintiff's knowledge or consent, causing harm.

38.     After surgery, Plaintiff developed a sideways gait; causing her to limp at all times when

she walked.

39.     After this surgery, Plaintiff was never able to pick up her two year old child again.

9

40.     In follow up, Dr. Durrani informed Plaintiff that the BMP-2 hardware "didn't take" and he would need to remove it and install new hardware.

41.     On or about December 12, 2007, Durrani performed a revision surgery on Plaintiff at Christ Hospital in which Durrani installed new hardware in Plaintiff's back.

42.     After the second surgery, Plaintiff's condition began deteriorating further and she was now in constant pain.

43.     Plaintiff had to install handicap ramps and a handicap toilet in the bathrooms at her house because of her decreased mobility due to surgeries.

44.     On March 9, 2009 Dr. Durrani performed a third surgery on Plaintiff at Christ Hospital extending the rods and screws from L3-S1.

45.     This surgery caused further deterioration in Plaintiff's body. She can no longer move her hips from side to side. She has to wear a bone stimulator device around her abdomen for 12 hours a day.

46.     After the third surgery, Dr. Durrani informed Plaintiff that the bone graft had once again "not taken" and he needed to try a new procedure on her.

47.     On or about August 2, 2010 Dr. Durrani performed a fourth surgery on Plaintiff at West Chester Hospital.

48.     Since the fourth surgery, Plaintiff can no longer control her bowels.

49.     Plaintiff continued to complain to which Dr. Durrani told her she would "have to learn to deal with it."

50.     Plaintiff is now handicapped, has occasional paralysis and is in constant pain.

51.     Upon information and belief, the surgeries performed by Dr. Durrani were medically unnecessary and improperly performed.

**Joseph & Elizabeth Baumgardner**
**10252 Limerick Circle**
**Latonia Lakes, KY 41015**

52.   On May 6, 2009 Plaintiff visited an emergency room at Deaconess Hospital for a severe

headache and a seizure like occurrence in his neck. At this visit, Plaintiff was referred to Dr.

Durrani for his pain.

53.   Plaintiff visited Dr. Durrani at the Deaconess Medical Building shortly after this

emergency room visit. Plaintiff had been experiencing the inability to perform motor skills in his

left hand, extreme headaches, eye strain and neck pain. Dr. Durrani recommended immediate

surgery consisting of a fusion of Plaintiff's cervical spine at C3-C4 and C5-C6. Dr. Durrani

informed Plaintiff this would take care of the pain he was experiencing and stop the deterioration

of motor skills in his left hand.

54.   Dr. Durrani performed surgery consisting of a fusion of the cervical spine on July 15,

2009 on Plaintiff at the Christ Hospital.

55.   Plaintiff followed up with Dr. Durrani at Dr. Durrani's CAST office.

56.   Plaintiff informed Dr. Durrani he was still experiencing pain following surgery and now

the pain radiated down from his shoulders into his back. There was also no decrease in the

deterioration of motor skills.

57.   Dr. Durrani recommended a second surgery on Plaintiff.  He told Plaintiff that he was

close to experiencing total paralysis from the neck down and needed to receive the second

surgery immediately.

58.   On November 12, 2009 Dr. Durrani performed a fusion of the cervical spine at the C1-C2

on Plaintiff at West Chester Medical Center.

59.     Plaintiff followed up with Dr. Durrani several times after the second surgery and consistently complained of increased pain and complete numbness.

60.     Plaintiff began having sleep issues following the second surgery due to his throat and airway becoming completely occluded while asleep. Plaintiff was placed on a CPAP machine and now must sleep upright.

61.     When Plaintiff complained of these things to Dr. Durrani, he was told he needed to "let his body heal". Dr. Durrani refused to see Plaintiff after the complaints become too persistent and told him to just "give it time."

62.     Upon information and belief, Dr. Durrani used Infuse/BMP-2 "off-label," without Plaintiff's knowledge or consent, causing Plaintiff harm.

63.     Upon information and belief, the surgeries performed by Dr. Durrani were medically unnecessary and improperly performed.

64.     As a direct and proximate result of these surgeries and Dr. Durrani's actions, Plaintiff has suffered harm.

65.     Plaintiff did not become aware of Dr. Durrani's use of Infuse/BMP-2 in him until he contacted his undersigned counsel.

**Troy Beckelhimer**
**975 Junction Pike**
**Berry, KY 41003**

66.     Around late 2007, Plaintiff went to the U.C. emergency room for left arm, neck, and back pain.

67.     It was here when Plaintiff saw Dr. Durrani for the first time.

68.     During his first interaction with Dr. Durrani, Dr. Durrani told Plaintiff if he did not undergo surgery with him, Plaintiff would become paralyzed.

69.     On December 13, 2007, Dr. Durrani operated on Plaintiff's cervical spine, fusing vertebrae together.

70.     Upon information and belief, Dr. Durrani used Infuse/BMP-2 or Puregen "off-label," without Plaintiff's knowledge or consent, causing Plaintiff harm.

71.     As a result of this surgery, Plaintiff's pain level increased significantly and Plaintiff lost flexibility.

72.     Nonetheless, Plaintiff continued treating with Dr. Durrani.

73.     At one of his post-op visits, Dr. Durrani told Plaintiff he was doing well and that he would be as good as new in one year if he underwent another surgery with Dr. Durrani—Plaintiff refused.

74.     Plaintiff continued treating with Dr. Durrani for a couple of years after his surgery.

75.     Currently, Plaintiff continues experiences pain every day, which is much worse than the pain he experienced before undergoing surgery with Dr. Durrani.

76.     Upon information and belief, the surgery performed by Dr. Durrani was medically unnecessary and improperly performed.

77.     As a direct and proximate result of this surgery and Dr. Durrani's actions, Plaintiff has suffered harm.

78.     Plaintiff did not become aware of Dr. Durrani's use of Infuse/BMP-2 or Puregen until he contacted his undersigned counsel.

**Shawnda Benton**
**1908 Savannah Way, Apt. #9**
**Cincinnati, OH 45224**

13

79.     In 2003, Plaintiff's primary care physician, Dr. Daugherty, referred her to Dr. Durrani at Children's Hospital.

80.     At the time of her referral, Plaintiff was experiencing shooting pains in her back that extended down her left leg and into her foot.

81.     Dr. Durrani ordered the Plaintiff to undergo x-ray, CT scan, and MRI procedures to determine the cause of her pain.

82.     After reviewing Plaintiff's radiology films, Dr. Durrani informed the Plaintiff that the source of her pain was her sciatic nerve, and that surgery was to only thing that would help her.

83.     On July 5, 2004, Dr. Durrani performed surgery on the Plaintiff consisting of a lumbar fusion with the implantation of hardware from L4-L5 at Christ Hospital.

84.     Upon information and belief, Dr. Durrani used Infuse/BMP-2 "off-label" in this surgery without Plaintiff's knowledge or consent, causing harm.

85.     After the surgery, Plaintiff continued to follow-up with Dr. Durrani for her postoperative care.

86.     Plaintiff pain increased following the July 5 surgery, and she began to experience new pain as well. Additionally, Plaintiff lost a great deal of her flexibility and mobility.

87.     As a result of the July 5, 2004 surgery, Plaintiff contracted a MRSA infection that required a second surgery to address.

88.     Plaintiff continued to attend postoperative care with Dr. Durrani until May of 2013.

89.     Though she continued to suffer from the increased pain she developed after the July 2004 surgery, Dr. Durrani's only response was to prescribe large amounts of painkillers.

90.     Plaintiff is now largely immobile and able to walk only sparingly and with assistance. She experiences constant pain which impairs her ability to live a normal life, and is unable to enjoy the daily activities in which she would partake prior to her surgery on July 5, 2004.

91.     Upon information and belief, the surgery performed by Dr. Durrani was medically unnecessary and improperly performed.

92.     As a direct and proximate result of these surgeries and Dr. Durrani's negligence, the Plaintiff has suffered harm.

93.     Plaintiff did not become aware of Dr. Durrani's use of Infuse/BMP-2 until legal counsel reviewed Plaintiff's bills.

### Leona Beyer
### 325 Kenyon Drive
### Hamilton, OH 45011

94.     In or around 2008, Ms. Beyer experienced intermittent, mild leg pain.

95.     In or around Spring 2008, Ms. Beyer sought treatment with Dr. Durrani at his private location.

96.     Upon information and belief, Dr. Durrani recommended that Ms. Beyer undergo surgery during the first office visit.

97.     Upon information and belief, Dr. Durrani did not offer any conservative treatment options.

98.     Dr. Durrani told Ms. Beyer the surgery would be minimally invasive and that she would experience immediate pain relief following the surgery.

99.     On or about June 26, 2008, Dr. Durrani performed an L3-S1 fusion and placed intervertebral rods, screws, and a cage in Ms. Beyer.

100. Upon information and belief, Dr. Durrani used Infuse/BMP-2 "off –label" and/or Puregen without Ms. Beyer's knowledge or consent, causing Ms. Beyer harm. This was not discovered until legal Counsel reviewed the bills.

101. Following the surgery, Ms. Beyer experienced extreme pain and immobility, and had several large scars on her back.

102. Further following the surgery, Ms. Beyer returned to Dr. Durrani at CAST for follow up appointments.

103. In or around September 2010, Ms. Beyer's intermittent right leg pain returned causing Ms. Beyer to suffer extreme and constant pain, instability, and radiculopathy on a constant basis.

104. Upon information and belief, Dr. Durrani acknowledged to Ms. Beyer that the hardware and fusion from the first surgery was a failure.

105. Dr. Durrani recommended Ms. Beyer undergo a second surgery to correct the failed fusion.

106. Dr. Durrani told Ms. Beyer that she would experience immediate pain relief after the surgery.

107. On or about February 18, 2011, Dr. Durrani performed surgery on Ms. Beyer at West Chester Hospital.

108. Upon information and belief, Dr. Durrani used Infuse/BMP-2 "off –label" and/or Puregen without Ms. Beyer's knowledge or consent, causing Ms. Beyer harm. This was not discovered until legal Counsel reviewed the bills.

109. Following the surgery, Ms. Beyer experienced immediate pain, numbness, and immobility.

16

110. Further following the surgery, Ms. Beyer attended follow up appointments with Dr. Durrani at CAST.

111. In or around March 2013, Ms. Beyer suffered a fall because of her extreme leg immobility and pain.

112. As a result of the fall, Ms. Beyer fractured her tailbone and continues to suffer pain.

113. Ms. Beyer now experiences constant pain, leg instability, a lack of balance, and the propensity to fall.

114. Ms. Beyer now additionally experiences embarrassment, which is emotionally draining.

115. Upon information and belief, the surgeries performed by Dr. Durrani were medically unnecessary and improperly performed.

**Michael Brophy**
**434 Birch Rd.**
**Erlanger, KY 41018**

116. Michael suffers from EDS, Ankylosing Spondylitis, scoliosis, kyphosis, asthma, Iritis, and Colitis. Michael was referred to Dr. Durrani to realign his spine.

117. During his consultations with Dr. Durrani, Dr. Durrani said that he would "fix" Michael's spine.

118. Dr. Durrani knew this statement was untrue. He made it with the intent of inducing Michael to undergo surgery, to Dr. Durrani's benefit.

119. Michael did in fact undergo the surgeries recommended by Dr. Durrani.

120. On April 19, 2008, Dr. Durrani performed surgery on Michael, implanting a medical device into Michael during the surgery.

121. Upon information and belief, Dr. Durrani used Infuse/BMP-2 "off-label" in Michael's surgery without Michael's knowledge or consent, causing harm.

17

122.   Michael had no knowledge that Infuse/BMP2 had been used in the surgery until he contacted counsel, earlier this month.

123.   Following the surgery, Michael continued to experience the same pain as before and also experienced less flexibility than he had before the procedure.

124.   Following the April 2008 surgery, Michael continued to follow up his care with Dr. Durrani.

125.   When Michael's pain continued, Dr. Durrani informed Michael that a second surgery would relieve the pain and increase his flexibility.

126.   Dr. Durrani knew this statement was a lie, and only made the statement to induce Michael to undergo a second, more complicated surgery, which Dr. Durrani believed would enhance his reputation in the field. Dr. Durrani also hoped to profit from the surgery.

127.   The statements did in fact induce Michael to undergo a second surgery, on November 26, 2008.

128.   After this second surgery, Michael was left in intense and constant pain.

129.   Michael returned to Dr. Durrani for help, and Dr. Durrani told him that he had done all that he could, and that Michael would be unsuccessful in finding help from other doctors because he was "such a liability".

130.   Dr. Durrani knew this statement was a lie, and made the statement with the intention of preventing Michael from seeking care which might uncover Dr. Durrani's negligence.

131.   The lie did in fact prevent Michael from seeking help for over a year.

132.   Upon information and belief, the surgery performed by Dr. Durrani on Michael was medically unnecessary and/or improperly performed, causing Michael harm.

133.    Upon help from a future physician, who has reduced but not eliminated the pain felt by

Michael, it was discovered that there remains in Michael's body a screw, causing him constant

pain, which cannot be removed due to its proximity to his abdominal aortic artery.

134.    The pain and suffering that Michael has undergone has made him at times suicidal.

### Andrew Carr
### 28529 Short Lane
### Brookeville, IN 47012

135.    On or about November 2004, Plaintiff first began treatment with Dr. Durrani for a

curvature in his spine at Cincinnati Children's Hospital Orthopedic Clinic.

136.    Dr. Durrani recommended spine surgery and informed Plaintiff he would fix a ruptured

disc at the L4-L5 level.

137.    On or about July 11, 2005 Dr. Durrani performed surgery on Plaintiff at Children's

Hospital.

138.    Following the first surgery, the curvatures in Plaintiff's spine became significantly worse.

139.    The displacement of Plaintiff's spine caused all of his internal organs to displace and

forced them to the left side of the body.

140.    In early 2007, Dr. Durrani informed Plaintiff he needed to perform another surgery to

stop the curvature of his spine from causing his lungs to collapse.

141.    Dr. Durrani promised Plaintiff he could fix the curvature of his spine so that he would be

as tall as he would have been without the scoliosis.

142.    On or about May 9, 2007 Dr. Durrani performed fusion surgery on Plaintiff at Christ

Hospital.

143.    Following the second surgery, Plaintiff only gained one inch in height, experienced

intense and chronic pain, and needed to walk with the aid of a cane almost continuously.

19

144. In the spring of 2008, Plaintiff felt a "pop" in his back and his legs went numb.

145. Following this incident, Plaintiff developed a lump on his back.

146. Dr. Durrani determined this was caused because a rod and two screws in Plaintiff's spine had broken and failed. Dr. Durrani informed Plaintiff the rods used in the surgery had been too long.

147. Dr. Durrani informed Plaintiff he needed immediate surgery to correct the mistake or there would be certain paralysis.

148. On or about February 5, 2010 Dr. Durrani performed a third surgery on Plaintiff at West Chester Hospital to repair the rod and screws and perform an Axial Lift.

149. Following the third surgery, Plaintiff continued to experience chronic and intense pain.

150. Upon information and belief, Dr. Durrani used Infuse/BMP-2 or Puregen "off-label" without Plaintiff's knowledge or consent, causing harm.

151. Upon information and belief, the surgeries performed upon Plaintiff were medically unnecessary.

**David Conger**
**653 Kathryn Drive**
**Wilmington, OH 45177**

152. In or around 2006, Mr. Conger was experiencing severe lower back and neck pain.

153. Mr. Conger had previously met Dr. Durrani at Cincinnati Children's Hospital with his son.

154. Dr. Durrani told Mr. Conger he also worked with adults at Christ Hospital.

155. Mr. Conger visited Dr. Durrani for a consultation in or around 2006.

156. Dr. Durrani told Mr. Conger that his L5-S1 was crushed and that he had disc degeneration.

20

157.   Dr. Durrani recommended that Mr. Conger undergo surgery.

158.   On or about February 7, 2007, Dr. Durrani performed an anterior fusion of the L3-4 and L5-S1 on Mr. Conger at Christ Hospital.

159.   Dr. Durrani used Infuse/BMP-2 "off-label" without Mr. Conger's knowledge or consent, causing Mr. Conger harm.

160.   Upon information and belief, Dr. Durrani used Puregen on Mr. Conger without Mr. Conger's knowledge or consent, causing Mr. Conger harm.

161.   Following the surgery, Mr. Conger experienced severe back pain and loss of flexibility.

162.   Mr. Conger met with Dr. Durrani for follow up appointments two weeks after the surgery, and again three months after the surgery.

163.   During a follow up consultation, Dr. Durrani told Mr. Conger that he had disc degeneration, which was putting strain on the remaining discs in his body.

164.   Dr. Durrani recommended Mr. Conger undergo another surgery.

165.   On or about November 14, 2007, Dr. Durrani performed a cervical discectomy and fusion of the C5-6 on Mr. Conger at Christ Hospital.

166.   Upon information and belief, Dr. Durrani used Infuse/BMP-2 "off-label" without Mr. Conger's knowledge or consent, causing Mr. Conger harm.

167.   Upon information and belief, Dr. Durrani used Puregen on Mr. Conger without Mr. Conger's knowledge or consent, causing Mr. Conger harm.

168.   Following the surgery, Mr. Conger experienced severe back pain and loss of flexibility.

169.   Further following the surgery, Mr. Conger continued to visit Dr. Durrani for follow up appointments.

170.   Dr. Durrani recommended Mr. Conger under go another surgery.

21

171.    On or about February 19, 2010, Dr. Durrani performed a cervical discectomy and fusion of the C6-7 on Mr. Conger at West Chester Hospital.

172.    Upon information and belief, Dr. Durrani used Infuse/BMP-2 "off-label" without Mr. Conger's knowledge or consent, causing Mr. Conger harm.

173.    Upon information and belief, Dr. Durrani used Puregen on Mr. Conger without Mr. Conger's knowledge or consent, causing Mr. Conger harm.

174.    Following the surgery, Mr. Conger experienced severe back pain and loss of flexibility.

175.    Further following the surgery, Mr. Conger visited Dr. Durrani at CAST for follow up appointments.

176.    Dr. Durrani recommended that Mr. Conger undergo another surgery.

177.    On or about May 4, 2011, Dr. Durrani performed a thoracic T5-8 fusion on Mr. Conger at West Chester Hospital.

178.    Upon information and belief, Dr. Durrani used Infuse/BMP-2 "off-label" without Mr. Conger's knowledge or consent, causing Mr. Conger harm.

179.    Upon information and belief, Dr. Durrani used Puregen on Mr. Conger without Mr. Conger's knowledge or consent, causing Mr. Conger harm.

180.    Following the surgery, Mr. Conger experienced severe back pain and loss of flexibility.

181.    Further following the surgery, Mr. Conger visited Dr. Durrani at CAST for follow up appointments.

182.    Dr. Durrani recommended that Mr. Conger undergo another surgery.

183.    On or about November 28, 2011, Dr. Durrani performed a C3-4 foraminotomy and decompression on Mr. Conger at West Chester Hospital.

22

184. Upon information and belief, Dr. Durrani used Infuse/BMP-2 "off-label" without Mr. Conger's knowledge or consent, causing Mr. Conger harm.

185. Upon information and belief, Dr. Durrani used Puregen on Mr. Conger without Mr. Conger's knowledge or consent, causing Mr. Conger harm.

186. Following the surgery, Mr. Conger experienced severe back pain and loss of flexibility.

187. Further following the surgery, Mr. Conger visited with Dr. Durrani at CAST for follow up appointments.

188. Dr. Durrani recommended Mr. Conger undergo another surgery.

189. On or about March 8, 2013, Dr. Durrani performed a left C3-4 and bilateral C4-5 hemilaminectomy, foraminotomy, and decompression on Mr. Conger at Journey Lite.

190. Upon information and belief, Dr. Durrani used Infuse/BMP-2 "off-label" without Mr. Conger's knowledge or consent, causing Mr. Conger harm.

191. Upon information and belief, Dr. Durrani used Puregen on Mr. Conger without Mr. Conger's knowledge or consent, causing Mr. Conger harm.

192. Following the surgery, Mr. Conger experienced severe back pain and loss of flexibility.

193. Further following the surgery, Mr. Conger continued to visit Dr. Durrani at CAST for follow up appointments.

194. Mr. Conger continued to treat with Dr. Durrani until the time of his arrest in or around July of 2013.

195. Mr. Conger began treating with Dr. Steven Agabegi who told Mr. Conger that his last two surgeries were not necessary.

196. Mr. Conger currently experiences low back pain, occasional sharp low back pain, neck pain, headaches, pain in the middle of his back and ribs, and scar pain.

23

197.    Mr. Conger now visits the V.A. Hospital for pain management.

198.    Upon information and belief, the surgeries performed by Dr. Durrani were medically unnecessary and improperly performed.

199.    As a direct and proximate result of Mr. Conger's surgeries, Dr. Durrani's negligence, and the Defendants negligence, Mr. Conger has suffered harm.

200.    Plaintiff did not become aware of Infuse/BMP-2 or Puregen until he contacted his undersigned counsel.

201.    The use of BMP-2 Infuse was off label and not proper for Plaintiff for the following reasons: wrong cages, multiple levels, posterior approach, BMP placed in cervical and thoracic spine.

202.    Dr. Durrani, as an agent of the Medtronic Defendants, did not inform Plaintiff of the risks associated with using BMP-2/Infuse® in an off-label manner, nor did he obtain informed consent to such use.

## Karen Crissinger
### 1228 W. Clark Street
### Springfield, Oh 45506

203.    In the summer of 2005, Plaintiff's primary care physician referred Plaintiff to Dr. Durrani for lower back pain and had difficulty walking.

204.    Before this time, Plaintiff received injections and nerve blocks but decided she did not want to have to go through this her entire life.

205.    Therefore, Plaintiff visited Dr. Durrani at Cincinnati Children's Hospital and Dr. Durrani immediately recommended lumbar spinal surgery.

206.    On July 7, 2005, Dr. Durrani performed Plaintiff's first surgery at Christ Hospital.

207.    Specifically, during this first surgery, Dr. Durrani performed a laminectomy, TLIF, posterior instrumentation, and posterior facet and intertransverse fusion at L4-L5.

208.    During this surgery, Dr. Durrani used Infuse/BMP-2 "off-label," without Plaintiff's knowledge or consent, causing Plaintiff harm.

209.    After this surgery, Plaintiff underwent physical therapy and treated with Dr. Durrani in Dayton, OH.

210.    Further, after this first surgery with Dr. Durrani, Plaintiff lost flexibility and developed pain in her left groin, which radiated down her left leg—a pain that never existed before Dr. Durrani performed surgery.

211.    Plaintiff told Dr. Durrani about her new groin pain and Dr. Durrani told her that he would have to do another surgery to fix it.

212.    On April 10, 2006, Dr. Durrani operated on Plaintiff at L2-L4, performing decompression, a posterior instrumental fusion, and a TLIF.

213.    During this surgery, Dr. Durrani used Infuse/BMP-2 "off-label," without Plaintiff's knowledge or consent, causing Plaintiff harm.

214.    Plaintiff followed up with Dr. Durrani at CAST twice after this second surgery and underwent more physical therapy.

215.    Throughout her course of treatment with Dr. Durrani, Dr. Durrani told her that Plaintiff must undergo another surgery in order to help her with her pain.

216.    On August 5, 2008, Dr. Durrani operated on Plaintiff's cervical spine at Christ Hospital.

217.    During this surgery, Dr. Durrani once again, used Infuse/BMP-2 "off-label," without Plaintiff's knowledge or consent, causing Plaintiff harm.

25

218.    After this surgery, Plaintiff began experiencing many problems she had never experienced before.  Specifically, Plaintiff began having difficulty swallowing and coughing, and experienced dizziness when she turned her head and numbness down both of her arms.  Further, Plaintiff began having limited flexibility in her neck.

219.    Plaintiff treated with Dr. Durrani until mid to late August of 2009.

220.    Currently, plaintiff continues experiencing pain and stiffness in her back and neck, dizziness, arm-numbness, and has difficulty swallowing.

221.    Upon information and belief, the surgeries performed by Dr. Durrani were medically unnecessary and improperly performed.

222.    As a direct and proximate result of these surgeries and Dr. Durrani's actions, Plaintiff has suffered harm.

223.    Plaintiff did not become aware of Dr. Durrani's use of Infuse/BMP-2 in her until she contacted her undersigned counsel.

**Joy Cullins**
**5429 Songbird Drive**
**Cincinnati, Oh 45239**

224.    Plaintiff was referred to Dr. Durrani by his secretary, Dianne Gatewood, at Children's Hospital in October 2006.

225.    At the time, Plaintiff was experiencing regular pain in her lower back and hips.

226.    Dr. Durrani immediately recommended that Plaintiff undergo a spinal fusion surgery. No conservative treatment options were discussed.

227.    Dr. Durrani told the Plaintiff that, if she did not have the surgery he recommended, she would become paralyzed as a result of the bones of her spine rubbing together.

228. On November 2, 2006, Dr. Durrani performed surgery on the Plaintiff consisting of a lumbar fusion with the installation of four surgical rods and a "box" in the Plaintiff's stomach at Christ Hospital.

229. Two days later, Plaintiff was taken from Christ Hospital to Cincinnati Children's Hospital Medical Center, where she met with Dr. Durrani and a "committee" of eight or nine other people.

230. Dr. Durrani exhibited slides of the surgery he performed on the Plaintiff to this group and introduced the Plaintiff to them, though she was still under the effects of painkillers.

231. Upon information and belief, the purpose of this meeting was to show to this committee the results of an experimental procedure that Dr. Durrani was the first surgeon to attempt.

232. Upon information and belief, no information regarding the possible experimental nature of this surgery was given to the Plaintiff prior to her procedure.

233. After the surgery, Plaintiff continued her postoperative care with Dr. Durrani at Children's Hospital.

234. At that time, Plaintiff was suffering from pervasive bodily pains that were most strongly concentrated in her back, legs, and neck.

235. Furthermore, Plaintiff had lost the ability to turn her head completely from left to right.

236. Plaintiff's postoperative care continued with Dr. Durrani until August of 2011.

237. Since the surgery, Plaintiff has lost a large portion of her mobility and flexibility. She suffers from constant pain in her back, legs, and hips that is worse than the pain she experienced prior to the surgery.

238. Upon information and belief, the surgery performed by Dr. Durrani was medically unnecessary and improperly performed.

27

239.     As a direct and proximate result of this surgery and Dr. Durrani's negligence, the Plaintiff has suffered harm.

240.     Plaintiff did not become aware of Dr. Durrani's use of Infuse/BMP-2 until legal counsel reviewed Plaintiff's bills.

**Margaret Dailey**
**599 Ivy Ridge Drive**
**Cold Spring, KY 41076**

241.     Plaintiff's daughter worked for the billing department at Children's Hospital and suggested her mother see Dr. Durrani in 2006 for low back and leg pain in both legs.

242.     In or around the spring 2006, at Plaintiff's initial visit with Dr. Durrani, Dr. Durrani told Plaintiff that she needed surgery because he could not see evidence of a prior surgery she had.

243.     Around the summer of 2006, Dr. Durrani performed a lumbar fusion at L4-L5 with instrumentation—that is, rods and screws.

244.     Upon information and belief, in this surgery, Dr. Durrani used BMP-2/Infuse or PureGen "off-label" causing Plaintiff harm.

245.     Plaintiff followed up with Dr. Durrani twice after the surgery; once two weeks after the surgery and once six weeks after the surgery.

246.     After the surgery, Plaintiff experienced severe pain in her lower back and both legs, which was worse than before her surgery with Dr. Durrani. Further, she had difficulty getting around.

247.     Plaintiff currently has a difficult time getting around, endures significant pain, and sees a pain management specialist.

248.     Upon information and belief, the surgery performed by Dr. Durrani was medically unnecessary and improperly performed. As a direct and proximate result of the surgery and Dr. Durrani's actions, Plaintiff has suffered harm.

28

249.    Plaintiff did not become aware of either Infuse/BMP-2 or PureGen until she contacted her undersigned counsel.

**Christina Goldstein**
**1422 Aschinger Blvd**
**Columbus, Oh 43212**

250.    Plaintiff's primary care physician referred her to Dr. Durrani in 2008.

251.    At that time, Plaintiff was experiencing severe lower back pain.

252.    Plaintiff had previously had four spinal fusion surgeries on her spine that proved to be ineffective.

253.    At the time she was referenced to Dr. Durrani Plaintiff had been diagnosed with Ehlers-Danlos Syndrome, an inherited connective tissue disease that makes spinal fusions highly unlikely to succeed.

254.    Dr. Durrani immediately recommended a series of lumbar surgeries; no conservative treatment options were explored.

255.    In or around November 2008, Dr. Durrani performed surgery on the Plaintiff consisting of a spinal fusion from S1-L5 at Children's Hospital ["the first surgery"].

256.    Upon information and belief, Dr. Durrani used BMP-2/Infuse "off-label" in this surgery without Plaintiff's knowledge or consent, causing harm.

257.    Plaintiff received postoperative care with Dr. Durrani after the surgery.

258.    Dr. Durrani told the Plaintiff that she would require another lumbar spine surgery within the year as her L3 was collapsing and would cause her more pain.

259.    In or around early 2009, Dr. Durrani performed surgery on the Plaintiff consisting of a spinal fusion from L3-L4 and L4-L5 at Christ Hospital ["the second surgery"].

29

260.    Upon information and belief, Dr. Durrani used BMP-2/Infuse or Puregen "off-label" in this surgery without Plaintiff's knowledge or consent, causing harm.

261.    In or around late 2009, Dr. Durrani performed surgery on the Plaintiff consisting of a neck surgery from C6-C7 at West Chester Hospital ["the third surgery"].

262.    Upon information and belief, Dr. Durrani used BMP-2/Infuse or Puregen "off-label" in this surgery without Plaintiff's knowledge or consent, causing harm.

263.    In or around 2011, Dr. Durrani performed surgery on the Plaintiff consisting of a cervical spine fusion from C4-C5 at West Chester Hospital ["the fourth surgery"].

264.    Upon information and belief, Dr. Durrani used BMP-2/Infuse or Puregen "off-label" in this surgery without Plaintiff's knowledge or consent, causing harm.

265.    Plaintiff's neck and back were severely bruised following this surgery, and little explanation was given for her condition.

266.    On April 22, 2013, Dr. Durrani performed surgery on the Plaintiff consisting of a cervical spine fusion on one side from C1-C2 at West Chester Hospital ["the fifth surgery"].

267.    Following this surgery, Plaintiff has experienced a long and painful recovery period. Her stitches have only just now begun to come out, and her cervical spine is unstable at both the top and bottom vertebrae pairs.

268.    In addition, Plaintiff is unable to turn her head as a result of pain and the sounds of grinding bone that result when she tries.

269.    Upon information and belief, the surgery performed by Dr. Durrani was medically unnecessary and improperly performed.

270.    As a direct and proximate result of these surgeries and Dr. Durrani's negligence, the Plaintiff has suffered harm.

271.    Plaintiff did not become aware of Dr. Durrani's use of Infuse/BMP-2 until legal counsel reviewed Plaintiff's bills.

### Carla Greissman
### 404 Victoria Dr.
### Trenton, Ohio 45067

272.    Around June of 2008, Plaintiff was referred to Dr. Durrani for neck pain.

273.    At her first visit with Dr. Durrani, Dr. Durrani stated if she did not undergo surgery with him, her neck issues would only get worse.

274.    Specifically, he told Plaintiff that if she did not have surgery, she would lose the ability to move her neck within 8–10 years, forcing her to stare down at the floor permanently.

275.    Further, he told Plaintiff that if she did not have surgery, her lungs would ultimately compress due to her spinal curvature, causing her breathing issues.

276.    These representations scared Plaintiff and therefore, she scheduled surgery with Dr. Durrani.

277.    On September 24, 2008, Dr. Durrani performed surgery on Plaintiff's thoracic spine at Christ Hospital.

278.    Specifically, Dr. Durrani performed an anterior and percutaneous posterior spinal fusion on Plaintiff at T2-L3.

279.    Upon information and belief, Dr. Durrani used Infuse/BMP-2 or PureGen "off-label," without Plaintiff's knowledge or consent, causing Plaintiff harm.

280.    After her surgery, Plaintiff experienced extreme pain in her neck and new pain in her back that she never had before undergoing surgery with Dr. Durrani.

281.    At her follow-up visits, Dr. Durrani recommended she undergo physical therapy.

282.    Plaintiff underwent physical land-based therapy and aqua therapy.

31

283. She treated with Dr. Durrani at CAST until December of 2009.

284. After her surgery with Dr. Durrani, Plaintiff experienced, and continues to experience, severe pain in her neck—pain much worse than she experienced before Dr. Durrani performed surgery—and new back pain.

285. Upon information and belief, the surgery performed by Dr. Durrani was medically unnecessary and improperly performed.

286. As a direct and proximate result of this surgery and Dr. Durrani's actions, Plaintiff has suffered harm.

287. Plaintiff did not become aware of Dr. Durrani's use of Infuse/BMP-2 in her until she contacted her undersigned counsel.

**Kathy Jill Hersley**
**505 East Main Street**
**Greensburg, In 47240**

288. Plaintiff first met Dr. Durrani when her daughter was a patient of his at Cincinnati Children's Hospital in early 2006.

289. At the time, Plaintiff was experiencing ongoing sharp pains in her lower back. I 0. Plaintiff asked Dr. Durrani to review her MRI results, after which review Dr. Durrani told the Plaintiff that several of her vertebrae were causing the Plaintiff pain by making contact with each other. Dr. Durrani immediately recommended surgery.

290. Dr. Durrani represented to the Plaintiff that he "could fix [her]" and that following the surgery he recommended she would be pain free.

291. On February 28, 2007, Dr. Durrani performed surgery on the Plaintiff consisting of a spinal fusion with installation of hardware from 15-SI at Christ Hospital.

292. Upon information and belief, Dr. Durrani used Infuse/BMP-2 or Puregen "off- label" in this surgery without Plaintiffs knowledge or consent, causing harm.

32

293.    Afterwards, Plaintiff attended postoperative care appointments with CAST at their West Chester office.

294.    Since the surgery on February 28, Plaintiff has been in constant pain and is unable to find comfort. She has lost the majority of what flexibility she previously enjoyed, and now has a hard time bending, sitting, standing, and laying for any significant period of time.

295.    Dr. Durrani saw Plaintiff only one time since her February surgery, at which time she received a shot for her pain and was referred out to a pain specialist.

296.    Plaintiff continues to suffer the same pain she had prior to her February surgery.

297.    In addition she now has pain in her hips and instability in her lower limbs, as well as pain and tenderness around the scars from her surgery.

298.    Upon information and belief, the surgery performed by Dr. Durrani was medically unnecessary and improperly performed.

299.    As a direct and proximate result of this surgery and Dr. Durrani's negligence, the Plaintiff has suffered harm.

300.    Plaintiff did not become aware of Dr. Durrani's use of Infuse/BMP-2 until legal counsel reviewed Plaintiffs bills.

**Kevin Hunley**
**13478 Service Road**
**Walton, Kentucky 41094**

301.    Plaintiff sought treatment with Dr. Durrani in 2006 for back and neck pain related to an automobile accident in 2004.

302.    Dr. Durrani recommended immediate surgery on the first visit.

303.    On January 31, 2007 Dr. Durrani performed thoracic spinal surgery and spinal fixation discectomy with cage fusion at Christ Hospital.

33

304.    Following surgery, Plaintiff's pain increased dramatically. Plaintiff continued to follow up with Dr. Durrani and complain of increasing pain.

305.    Dr. Durrani told him to "give it time to heal."

306.    Plaintiff continues to have pain in his back as well as head and neck aches. He is currently rendered disabled as a result of this surgery.

307.    Upon information and belief, Dr. Durrani used Infuse/BMP-2 "off –label" and/or Puregen without Mr. Hunley's knowledge or consent, causing Mr. Hunley harm.

308.    Upon information and belief, the surgery performed by Dr. Durrani was medically unnecessary and improperly performed.

309.    As a direct and proximate result of Mr. Hunley's surgery, Dr. Durrani's negligence, and the Defendant's negligence, Mr. Hunley has suffered harm.

310.    Plaintiff did not become aware of Infuse/BMP-2 and/or Puregen until he contacted his undersigned counsel.

### George Hutchinson
### 3951 West 8th Street
### Cincinnati, OH 45205

311.    Mr. Hutchinson had been experiencing hand numbness and having difficulty griping objects in 2008 when he was referred to Defendant Durrani.

312.    Dr. Durrani ordered an MRI on Mr. Hutchinson and recommended that Mr. Hutchinson undergo cervical surgery.

313.    Dr. Durrani performed cervical surgery on Mr. Hutchinson at Christ Hospital in 2008.

314.    Upon information and belief, the surgery was medically unnecessary and improperly done.

34

315.   Upon information and belief, Defendants experimentally used BMP-2/Infuse "off-label" without Mr. Hutchinson's knowledge or consent.

316.   After Dr. Durrani performed cervical surgery on Mr. Hutchinson, Mr. Hutchinson was unable to walk.

317.   Mr. Hutchinson spent one month in Drake Rehab. Mr. Hutchinson was unable to balance and was still in a wheelchair after one month of rehabilitation in Drake Rehab.

318.   Mr. Hutchinson had to go on disability and subsequently was evicted after the surgery because he was unable to walk or work.

319.   IN or around 2010, Mr. Hutchinson went to his follow-up appointment with Dr. Durrani at CAS.

320.   Dr. Durrani ordered a second MRI and then recommended L5-S1 surgery for Mr. Hutchinson.

321.   Dr. Durrani performed a second surgery on Mr. Hutchinson in or around 2010 at Christ Hospital.

322.   Defendants experimentally used BMP-2/Infuse "off-label" without Mr. Hutchinson's knowledge or consent.

323.   During the surgeries, Defendants did not use the LT-CAGE.

324.   Following the surgery, Mr. Hutchinson's pain became far worse and more extreme. Plaintiff states that he is in severe pain and that he can barely walk and must use a cane, and is completely disabled now.

325.   Mr. Hutchinson was misled by Defendants concerning the extent, nature and duration of the surgery that was to be performed.

326.    Upon information and belief, the surgeries by Defendants were medically contraindicated and/or incorrectly done.

### Martha & Steven Hutton
### 10160 Crossing Drive, #78
### Cincinnati, Oh 45241

327.    Plaintiff was referred to Dr. Durrani in 2008 by her primary care physician, Dr. Timothy Linker.

328.    At the time, Plaintiff was experiencing some lower back pain that had begun to radiate down into her legs.

329.    Dr. Durrani immediately recommended that Plaintiff undergo surgery to correct her lower back pain.

330.    In or about late 2008, Dr. Durrani performed surgery on the Plaintiff consisting of a lumbar spinal fusion from L5-S1 at Christ Hospital ["the first surgery"].

331.    Upon information and belief, Dr. Durrani used Infuse/BMP-2 "off-label" in this surgery without Plaintiff's knowledge or consent, causing harm.

332.    Plaintiff received postoperative care from Dr. Durrani periodically over the next six months at his office in Blue Ash.

333.    After this surgery Plaintiff lost a measure of her flexibility, but otherwise experienced no decrease in pain.

334.    Dr. Durrani told the Plaintiff that her recovery was "great" and that she should continue coming in for regular postoperative care.

335.    However, in late 2011 Dr. Durrani recommended that the Plaintiff undergo an additional surgery.

336.    In or about early 2012, Dr. Durrani performed surgery on the Plaintiff consisting of a bone spur removal that had developed at the site of Plaintiff's previous surgery at Christ Hospital ["the second surgery"].

337.    Upon information and belief, Dr. Durrani used Infuse/BMP-2 or Puregen "off-label" in this second surgery without Plaintiff's knowledge or consent, causing harm.

338.    After this surgery, Plaintiff continued to receive postoperative care from Dr. Durrani at his CAST offices.

339.    However, Plaintiff became dissatisfied with Dr. Durrani's services after being forced to wait 2-3 hours at a time before seeing him.

340.    Plaintiff ended her treatment with CAST and Dr. Durrani in the summer of 2012.

341.    Plaintiff continues to suffer from lower back pain that is growing increasingly worse.

342.    Plaintiff is now unable to stand, sit, or lie down unaided for more than a short period of time without suffering from tremendous pain.

343.    Upon information and belief, the surgeries performed by Dr. Durrani were medically unnecessary and improperly performed.

344.    As a direct and proximate result of these surgeries and Dr. Durrani's negligence, the Plaintiffs have suffered harm.

345.    Plaintiffs did not become aware of Dr. Durrani's use of Infuse/BMP-2 until legal counsel reviewed Plaintiffs' bills.

### Sara Jonas
### 6502 Jennifer Court
### Liberty Township, Ohio 45044

346.    Plaintiff sought treatment from Dr. Durrani in approximately 2008 for lower back pain.

347.    Dr. Durrani recommended spinal fusion surgery on Plaintiff to alleviate her pain.

37

348.    On or about August 6, 2008, Dr. Durrani performed surgery on Plaintiff at Christ Hospital.

349.    Immediately following surgery Plaintiff's pain increased in intensity in her back. She also began experiencing frequent excruciating muscle spasms.

350.    Plaintiff continued to follow up with Dr. Durrani and complain of the new and increased pain.

351.    Plaintiff attempted to relieve her pain from surgery with various types of therapy and treatment but nothing helped her discomfort.

352.    Plaintiff sought treatment with another spine doctor who performed a revision surgery to repair Plaintiff's back from the surgery performed by Dr. Durrani.

353.    Plaintiff continues to suffer from severe and constant back pain as a result of surgery performed by Dr. Durrani.

354.    Upon information and belief, Dr. Durrani used Infuse/BMP-2 "off –label" and/or Puregen without Mrs. Jonas's knowledge or consent, causing Mrs. Jonas harm.

355.    Upon information and belief, the surgery performed by Dr. Durrani was medically unnecessary and improperly performed.

356.    As a direct and proximate result of Mrs. Jonas's surgery, Dr. Durrani's negligence, and the Defendants' negligence, Mrs. Jonas has suffered harm.

357.    Plaintiff did not become aware of Infuse/BMP-2 and/or Puregen until she contacted her undersigned counsel.

**Deborah Kidd**
**1625 Asmann Avenue, Apt. 4**
**Cincinnati, OH 45229**

358.    Plaintiff was experiencing pain in her lower back with shooting pain into her upper thighs

38

when she was referred to Dr. Durrani.

359.    Dr. Durrani scheduled her for a lumbar fusion in September 2006.

360.    In September 2006, Dr. Durrani performed a lumbar fusion surgery on the Plaintiff at West Chester Hospital ["the first surgery"].

361.    Upon information and belief, Dr. Durrani used BMP-2/Infuse or Puregen "off-label" in this first surgery without Plaintiff's knowledge or consent, causing harm.

362.    Following this surgery, Plaintiff's pain in her lower back and upper thighs showed no improvement.

363.    Furthermore, Plaintiff began developing some numbness in her legs.

364.    In early 2007, Plaintiff began having problems walking and developed a significant limp.

365.    From 2006 through 2010, Plaintiff continued her care with Dr. Durrani.

366.    Plaintiff tried to alleviate the issues she was having with physical therapy and other care, but none of her pain showed any improvement.

367.    In 2010, Dr. Durrani informed Plaintiff that she had bulging discs in her lower back, and that surgery placing more rods and screws in her back would be needed.

368.    In September 2010, Dr. Durrani performed surgery on the Plaintiff consisting of hardware implantation from L3-L5 at West Chester Hospital ["the second surgery"].

369.    Upon information and belief, Dr. Durrani used BMP-2/Infuse or Puregen "off-label" in this second surgery without Plaintiff's knowledge or consent, causing harm.

370.    Following this surgery, Plaintiff's pain returned and became worse.

371.    Plaintiff began to suffer from excruciating pain in her groin that was not present prior to the second surgery.

372.    From 2012 through 2012, Plaintiff continued her care with Dr. Durrani and CAST.

39

373. During this time period she was given injections in her spine to try to alleviate her pain.

374. One procedure to alleviate Plaintiff's pain included having one of her nerves burned off, a feeling that Plaintiff described as "the most painful thing she has ever experienced in her entire life."

375. Furthermore, Plaintiff's lower back and leg pain grew worse.

376. Additionally, some of her toes became numb and now have little to no feeling.

377. Plaintiff also began to have headaches that she believed were associated with stress.

378. Dr. Durrani told the Plaintiff that these headaches were the result of bulging discs in her neck that would require surgery to fix.

379. On August 13, 2012, Plaintiff underwent surgery consisting of a cervical fusion from C2-C7 at West Chester Hospital ["the third surgery"].

380. Upon information and belief, Dr. Durrani used BMP-2/Infuse or Puregen "off-label" in this third surgery without Plaintiff's knowledge or consent, causing harm.

381. Upon information and belief, Dr. Nael Shanti performed this surgery instead of Dr. Durrani, without obtaining the informed consent of the Plaintiff.

382. Following this surgery, Mrs. Kidd developed shoulder and neck pain that she had never experienced prior to the cervical fusion.

383. Following this August 2012 surgery, Plaintiff has had to wear a neck brace at all times.

384. Plaintiff continued her care with Dr. Durrani and CAST until April 2013 when Dr. Durrani could no longer use Plaintiff's insurance company.

385. Following the last surgery, Dr. Durrani told Plaintiff at CAST that her postoperative pain and problems were "normal".

386. In June 2013, Plaintiff underwent an MRI at Christ Hospital which indicated "L3-L4

40

interbody bone graft retropulsion"; a leakage of the BMP-2/Infuse in her spine. After receiving this information, Plaintiff sought legal advice.

387.    As a direct result of these unnecessary and improperly performed surgeries, Plaintiff's life has been forever changed for the worse.

388.    Upon information and belief, the surgery performed by Dr. Durrani was medically unnecessary and improperly performed.

### Maggie Knauer
### 446 Shannon Circle
### Batavia, OH 45103

389.    Around the spring of 2008, Plaintiff visited her primary care physician for low to mid back pain, neck pain, arm numbness, and leg pain and numbness.

390.    Her primary care physician referred Plaintiff to Dr. Durrani at Christ Hospital.

391.    At her first visiting Dr. Durrani, Dr. Durrani recommended Plaintiff undergo two surgeries—one for her neck, the other for her back.

392.    On March 7, 2008, Dr. Durrani performed a C4–5 fusion on Plaintiff at Christ Hospital.

393.    Upon information and belief, during Plaintiff's surgery, Dr. Durrani used Infuse/BMP-2 or PureGen "off-label," without Plaintiff's knowledge or consent, causing Plaintiff harm.

394.    After her surgery, Plaintiff experienced severe pain—pain much worse than the pain she experienced before the surgery.

395.    At her follow-up visits, Dr. Durrani recommended she undergo physical therapy and go through with a second surgery.

396.    Because of her extreme pain after her first surgery, Plaintiff decided not to undergo a second surgery with Dr. Durrani.

397.    She treated with Dr. Durrani until about April of 2008.

398.    After her surgery with Dr. Durrani, Plaintiff experienced, and continues to experience, severe pain in her neck and back, which radiates to her fingers and legs, and has lost flexibility.

399.    Because Plaintiff has difficulty walking and gripping her cane, she is dependent on other people for assistance and stays inside most days.

400.    Upon information and belief, the surgery performed by Dr. Durrani was medically unnecessary and improperly performed.

401.    As a direct and proximate result of this surgery and Dr. Durrani's actions, Plaintiff has suffered harm.

402.    Plaintiff did not become aware of Dr. Durrani's use of Infuse/BMP-2 or PureGen until she contacted her undersigned counsel.

403.    The use of BMP-2 Infuse was off label and not proper for Plaintiff for the following reasons: BMP used in cervical spine, wrong cage.

404.    Dr. Durrani, as an agent of the Medtronic Defendants, did not inform Plaintiff of the risks associated with using BMP-2/Infuse® in an off-label manner, nor did he obtain informed consent to such use.

### Rose Koehler
### 7060 Maud Hughes Rd.
### Hamilton, OH 45011

405.    Prior to May 2007 Plaintiff had been prescribed "mood stabilizers" by her primary care physician, Dr. Craig Sanders, in order to combat her depression.

406.    On May 15, 2007, Plaintiff fell from a freeway bridge into the Ohio River, after which she was hospitalized for a burst fracture of her T12 vertebra and a fractured coccyx.

407.   Plaintiff first began to meet with Dr. Durrani on May 31, 2007 for treatment of significant pain in her mid-back and coccyx. She had also begun to experience numbness in her feet.

408.   Dr. Durrani initially treated Plaintiff's back pain with a body brace, however by November of 2007 Dr. Durrani began to recommend that Plaintiff "[e]ither live with [the] pain" or undergo surgery.

409.   Dr. Durrani assured the Plaintiff that the surgery would only result in "three small incisions" and that undergoing the surgery would allow her to return to her previous state of health and activity.

410.   Dr. Durrani told the Plaintiff that he had worked on many athletes, and that he was "the best orthopedic surgeon in the country."

411.   On March 26, 2008 Dr. Durrani performed surgery on the Plaintiff consisting of a posterior spinal fusion from T10-L1 at Christ Hospital ["the first surgery"].

412.   Dr. Durrani used Infuse/BMP-2 "off-label" in this first surgery without Plaintiff's knowledge or consent, causing harm.

413.   When Plaintiff awoke, she found that her surgical incisions were much larger than Dr. Durrani had represented to her prior to the surgery.

414.   Dr. Durrani told the Plaintiff that he had found more broken vertebrae in her spine once the surgery had begun, and that these breaks were not capable of being discovered during pre-surgery imaging procedures.

415.   Plaintiff underwent physical therapy with Dr. Durrani for her postoperative care.

416.   Shortly thereafter, Plaintiff's neck began to swell and become painful.

43

417.   Dr. Durrani told the Plaintiff that she had "spinal stenosis" and recommended that she undergo another surgery to "open the vertebrae so her spinal cord would have room."

418.   Dr. Durrani told the Plaintiff that she would need to have two to three vertebrae in her neck repaired.

419.   On February 25, 2009 Dr. Durrani performed surgery on the Plaintiff consisting of a laminoplasty from C3-C7 at Christ Hospital ["the second surgery"].

420.   Upon information and belief, Dr. Durrani used Infuse/BMP-2 or Puregen "off-label" in this surgery without Plaintiff's knowledge or consent, causing harm.

421.   The procedure Dr. Durrani actually performed went beyond his stated "two to three" vertebrae repair about which he had spoken to the Plaintiff.

422.   Plaintiff wore a brace after this surgery, but soon began suffering from severe headaches and several bouts of vomiting.

423.   Dr. Durrani told Plaintiff to see a neurologist "before blaming it on the neck."

424.   Plaintiff continued postoperative care with Dr. Durrani until October 13, 2009. However, he made no further reference to her headaches in his notes.

425.   Since her treatment by Dr. Durrani has ceased, Plaintiff now suffers from worse pain in her back and neck than she did prior to his surgeries

426.   Upon information and belief, the surgeries performed by Dr. Durrani were medically unnecessary and improperly performed.

427.   As a direct and proximate result of these surgeries and Dr. Durrani's negligence, the Plaintiff has suffered harm.

428.   Plaintiff did not become aware of Dr. Durrani's use of Infuse/BMP-2 until legal counsel reviewed Plaintiff's bills.

**Shannon Koehler**
**135 Montclair Street**
**Ludlow, Ky 41016**

429.    In or around 2007, Ms. Koehler began experiencing pain in her neck, through her shoulders, into her arms causing numbness and tingling in her arms and hands.

430.    Ms. Koehler's sister referred her to Dr. Durrani.

431.    Ms. Koehler first met with Dr. Durrani at Christ Hospital.

432.    Dr. Durrani ordered X-Rays and an MRI for Ms. Koehler.

433.    At Ms. Koehler's next appointment, Dr. Durrani told Ms. Koehler there were two deteriorated discs in her neck that were touching the bone and that she would need surgery.

434.    Dr. Durrani was unable to get Ms. Koehler in for immediate surgery, so she opted to undergo surgery with Dr. Agabegi, who worked in the same office.

435.    In or around September 2008, Dr. Agabegi performed surgery on Ms. Koehler at Christ Hospital.

436.    Following the surgery, Ms. Koehler's pain returned.

437.    Ms. Koehler made another appointment to visit Dr. Durrani.

438.    Dr. Durrani ordered new X-Rays for Ms. Koehler.

439.    Dr. Durrani read the X-Rays and told Ms. Koehler that he could either repair Dr. Agabegi's work or re-do the work.

440.    Ms. Koehler agreed to let Dr. Durrani re-do Dr. Agabegi's work.

441.    Dr. Durrani told Ms. Koehler that once she recovered from surgery she would be better than she was before.

442.    In or around July 2009, Dr. Durrani performed surgery on Ms. Koehler at Christ Hospital.

443. Upon information and belief, during this surgery, Dr. Durrani used Infuse/BMP-2 and/or Puregen, without Ms. Koehler's knowledge or consent, causing Ms. Koehler harm.

444. Following the surgery, Ms. Koehler began to experience more severe problems with her back.

445. Ms. Koehler made an appointment with Dr. Durrani at Deaconess Hospital.

446. Dr. Durrani told Ms. Koehler that she needed six discs in her back replaced and fused and also needed rods inserted.

447. Dr. Durrani told Ms. Koehler that once she recovered from surgery she would be better than she was before.

448. In or around January 2010, Dr. Durrani performed back surgery on Ms. Koehler at West Chester Hospital.

449. Upon information and belief, during this surgery, Dr. Durrani used Infuse/BMP-2 and/or Puregen, without Ms. Koehler's knowledge or consent, causing Ms. Koehler harm.

450. Following the surgery, Ms. Koehler was in the ICU for one week.

451. Ms. Koehler had to visit the Emergency Room at West Chester Hospital because of the pain, and was given pain medication and warm water enemas.

452. Ms. Koehler continued to follow up with Dr. Durrani at CAST.

453. Dr. Durrani recommended that Ms. Koehler receive injections from Dr. Tayeb.

454. Ms. Koehler's pain continued to increase.

455. Dr. Durrani ordered a new MRI.

456. Dr. Durrani read the MRI and told Ms. Koehler she would need another surgery.

457. Ms. Koehler began to develop severe migraines before her surgery.

46

458.    Ms. Koehler made an emergency appointment with Dr. Durrani and Dr. Tayeb at CAST because her migraines were so severe.

459.    Dr. Durrani and Dr. Tayeb recommended injections to alleviate the pain.

460.    Ms. Koehler had the injections done at CAST.

461.    Dr. Durrani told Ms. Koehler that once she recovered from surgery, she would be better than before.

462.    In or around 2011, Dr. Durrani performed surgery on Ms. Koehler's neck at West Chester Hospital.

463.    Upon information and belief, during this surgery, Dr. Durrani used Infuse/BMP-2 and/or Puregen, without Ms. Koehler's knowledge or consent, causing Ms. Koehler harm.

464.    Following the surgery, the pain in Ms. Koehler's neck and back pain continued to get worse.

465.    Dr. Durrani told Ms. Koehler he did not know why the pain continued.

466.    Ms. Koehler continued to receive injections for the pain.

467.    In or around summer 2011, Ms. Koehler developed severe gastrointestional issues.

468.    Ms. Koehler's neck and back pain continued to increase so she made another appointment with Dr. Durrani.

469.    Dr. Durrani ordered new X-Rays and an MRI.

470.    Dr. Durrani told Ms. Koehler she would need another surgery.

471.    Dr. Durrani told Ms. Koehler that once she recovered from surgery, she would be better than before.

472.    In or around July 2012, Dr. Durrani performed neck surgery on Ms. Koehler at West Chester Hospital.

47

473.    Upon information and belief, during this surgery, Dr. Durrani used Infuse/BMP-2 and/or Puregen, without Ms. Koehler's knowledge or consent, causing Ms. Koehler harm.

474.    Following the surgery, Dr. Durrani told Ms. Koehler everything went well.

475.    Further following the surgery, Ms. Koehler had to wear a neck brace and use a walker to get around.

476.    Ms. Koehler's marital and family life began to suffer.

477.    Ms. Koehler visited Dr. Durrani at CAST.

478.    Ms. Koehler told Dr. Durrani her pain was still not better.

479.    Dr. Durrani recommended a fifth surgery.

480.    Ms. Koehler did not undergo a fifth surgery.

481.    Ms. Koehler now experiences constant neck and thoracic pain as well as muscle spasms, shooting pain down her legs, and numbness and tingling down her legs.

482.    Ms. Koehler's husband left her as a result of her constant pain, surgeries, and medical bills.

483.    Upon information and belief, the surgeries performed by Dr. Durrani were medically unnecessary and/or improperly performed.

484.    As a direct and proximate result of Ms. Koehler's surgeries, Dr. Durrani's negligence, and the Defendants Negligence Ms. Koehler has suffered harm

485.    Ms. Koehler did not become aware of Dr. Durrani's use of Infuse/BMP-2 or PureGen until she contacted her undersigned counsel.

**Patricia Legendre**
**1010 Morado Drive**
**Cincinnati, OH 45238**

486.    On or about May 2007, Plaintiff was in vacation in the Dominican Republic. While on a

48

ride on a speedboat it hit a wave and broke her back.

487.    Plaintiff was life flighted back to the Cincinnati-Northern Kentucky Airport, located in Boone County Kentucky.

488.    Plaintiff was taken by ambulance from the Cincinnati-Northern Kentucky Airport to UC Hospital in Cincinnati, Ohio.

489.    Durrani was at UC Hospital and offered to "check out" Plaintiff.

490.    Durrani appeared to be "scouting" for patients in the Emergency Department of University Hospital.

491.    Durrani saw Plaintiff in the Emergency Department at UC Hospital, and had an MRI performed.

492.    Durrani recommended spine surgery the first time he saw Plaintiff.

493.    Durrani told Plaintiff she needs surgery and would also need rods and screws.

494.    Durrani told the Plaintiff that due to the severity of her injuries, surgery was her only option. He also told her she was a "hair from being paralyzed."

495.    Durrani, nor Defendants University Hospital or UC Health ever suggested or gave Plaintiff any other course of action or alternative, but surgery.

496.    Plaintiff remained in the University Hospital, under the management of UC Health Physicians, and even upon Plaintiff expressing great dissatisfaction over not seeing Durrani, no other Physician was recommended or came in to present a second opinion or alternative to Plaintiff.

497.    Medical staff continued to tell Plaintiff that Durrani would be in, Plaintiff saw Durrani only two times while hospitalized at University Hospital, under the management of UC Health.

    Once in the Emergency Department and once in her patient room, her stay was

49

approximately 4 days at University Hospital.

498.  Plaintiff had partial paralysis, and could not walk, and was in debilitating pain.

499.  Durrani transferred patient directly from University Hospital to The Christ Hospital.

500.  At no time prior to the surgery was the Plaintiff released from the care of a medical facility.

501.  Patricia Legendre was admitted to Christ Hospital in May of 2007.

502.  Durrani performed surgery at Christ Hospital within a week of seeing Plaintiff at University  Hospital Emergency Department, under the management of UC Health.

503.  Durrani installed two rods and four screws, into the Plaintiffs back, and made a fusion of vertebrae.  [the "first surgery"] was performed in May 2007.

504.  During the first surgery, Defendant negligently and improperly placed hardware in Plaintiff, causing harm.

505.  During the first surgery, upon information and belief BMP-2/Infuse was used in surgery in May of 2007.

506.  Defendants experimentally used BMP-2/Infuse without Plaintiffs consent or knowledge.

507.  Defendants did not obtain Plaintiffs consent to use BMP-2/Infuse prior to the first surgery.  During the first surgery, Defendant did not use the LT-CAGE.

508.  Also during the first surgery, Defendant did not use an "Anterior" surgical approach, in contradiction to what was approved by the FDA.

509.  Defendants did not obtain Plaintiffs informed consent to use BMP-2/Infuse "off label" in his thoracic spinal surgery.

510.  Defendants improperly used BMP-2/Infuse on Plaintiff, causing harm.

511.  Dr. Durrani promised that Plaintiff would experience immediate pain relief following

surgery. Instead, his pain has been far worse and more extreme since the fust surgery.

512.    Plaintiff was misled by Defendant concerning the extent, nature and duration of the surgery that was to be performed.

513.    Upon information and belief, the first surgery by Defendant was medically unnecessary.

514.    At all times relevant, Defendant was in exclusive control of amount and ratio of BMP-2/Infuse bone graft that experimentally implanted into Plaintiff at Christ Hospital.

515.    At all times relevant, Defendant was responsible for the selection, modification, bending, cutting, sizing and placement of the rods, screws and hardware Durrani implanted into Patricia Legendre.

516.    Plaintiff was discharged from Christ Hospital in May of 2007.

517.    Durrani misled Plaintiff about the after-effects of BMP/Infuse and the actual nature and extent of the surgery Defendant had performed. No conservative treatment options were tried, discussed with, and/or recommended to Plaintiffs prior to Dr. Durrani telling Patricia Legendre she needed surgery.

518.    At the six week follow up visit Plaintiff was prescribed medication and aquatic therapy by Durrani.

519.    Plaintiff experienced no relief from this unnecessary surgery and experiences continued and ongoing pain as a result of the negligent performance of the surgery.

520.    Plaintiff was forced to terminate the Durrani ordered and required aquatic therapy sessions, because she developed an infection in her back, as a result of her incisions not being healed properly.

521.    Plaintiff called back and spoke with Sherri from Durrani's office and told her things were not feeling correct. Plaintiff demanded another MRI.

522.    Following the surgery, this new pain and symptomolgy never resolved or subsided.

523.    Plaintiff continued to complain to Dr. Durrani at his offices that since the first surgery, the pain had become so extreme, she couldn't bear it.

524.    The pain, numbness and immobility did not resolve, and Plaintiff continued to trust Durrani that over time, these conditions would improve.

525.    Plaintiff was experiencing back spasms which prevented her from effectively performing her duties at work.

526.    Plaintiff went to her immediate manager and friend and lifted up the back of her shirt and asked her if she could see what her back was doing. Her back was in spasm, and her manager could see movement.

527.    Plaintiff manager ran her hand over her back, per Plaintiffs request to see if she could feel the protrusions Plaintiff felt on her back, and her manager could.

528.    Plaintiff continued to complain to Durrani's office of her pain, spasms and protrusions which had appeared on her back.

529.    Durrani's CAST office response was this was all in Plaintiffs head and she was imagining things.

530.    In September 2007 Plaintiff attended another follow up appointment, during this appointment there was another Physician shadowing Durrani.

531.    Durrani read MRI and told Plaintiff, the screws he installed went clear through vertebrae, and they were moving around in her back and loose. That the fusion he performed "crushed".

532.    Durrani told Plaintiff he wanted to do a corrective surgery to "fix" the screws, and perform a new bone fusion.

533.    Durrani told Plaintiff if she did not have corrective surgery, "I will not give you pain

meds."

534.    Durrani told Plaintiff at this September 2007 appointment that the reason the screws and fusion failed was due to her soft bone.

535.    Plaintiff was irate with Durrani and asked him "why he performed the surgery knowing it would fail, if he knew her bones were soft, and why he did not give her something to strengthen her bones?"

536.    Durrani responded stating "it was not his responsibility to give her something to strengthen her bones, it was her primary care doctor's responsibility." Plaintiff told Durrani "it was his responsibility to give her something to strengthen her bones, because he was performing surgery, not her primary care doctor."

537.    Plaintiff said subject quickly changed back to surgery, and Durrani expressed that if she would not let him perform an additional surgery, he would no longer help her.

538.    Plaintiff expressed concern to Durrani over her noticeable weight loss, despite being on pain medication.

539.    Durrani came up behind Plaintiff, slapped her on her posterior and stated "it not like you didn't need to lose it anyway."

540.    At all times, during each examination by Durrani, his assistant Sherri was present.

541.    After this incident Sherri lowered her head and looked away from client.

542.    Due to this failed procedure and no continued faith in Durrani Plaintiff sought a second opinion.

543.    Subsequently the Plaintiff went to see Dr. Jeff Stambough, in Norwood, Ohio.

544.    Dr. Stambough said to Plaintiff "I don't know why rods and screws were put in your back?"

545.    In early 2008 Dr. Stambough removed rods and screws placed in Plaintiff back by Durrani. He also refused the portion of bone which crushed after completion of fusion by Durrani.

546.    Stambough performed this revision surgery at Christ Hospital.

547.    Plaintiffs medical and pain condition worsened as a result of the first surgery, and Plaintiff developed new, different neck and back pain, and radiating pain.

548.    Plaintiff used physical therapy, pain management and other ancillary therapies.

549.    Plaintiff's medical condition as a result of the Defendants conduct was extreme and horrible, but Durrani continued to falsely document at CAST progress notes that Plaintiff was improving.

### Derek List
### 5049 Sandman Dr. #75
### Taylor Mill, KY 41015

550.    The use of BMP-2 Infuse was off label and not proper for Plaintiff for the following reasons: 18 years old (poss. Immature), smoker, Concorde cage, TLIF approach.

551.    Dr. Durrani, as an agent of the Medtronic Defendants, did not inform Plaintiff of the risks associated with using BMP-2/Infuse® in an off-label manner, nor did he obtain informed consent to such use.

### Tonia McQueary
### 5807 Melody Lane
### Milford, OH 45150

552.    In 2007, Tonia McQueary was referred to Dr. Durrani after she began to experience pain in her head and neck.

553.    In July 2007, Dr. Durrani performed surgery on the Plaintiff consisting of a discectomy and spinal fusion from C6-C7 at Christ Hospital ["the first surgery"].

54

554.    Upon information and belief, Dr. Durrani used BMP-2/Infuse or Puregen "off-label" in this first surgery without Plaintiff's knowledge or consent, causing harm.

555.    Following the first surgery, Mrs. McQueary continued her treatment with Dr. Durrani.

556.    Sometime between July 2007 and March 2009, Dr. Durrani performed surgery on the Plaintiff consisting of a T7-T10 fusion at Christ Hospital ["the second surgery"].

557.    Upon information and belief, Dr. Durrani used BMP-2/Infuse or Puregen "off-label" in this second surgery without Plaintiff's knowledge or consent, causing harm.

558.    Mrs. McQueary continued to treat with Dr. Durrani, and when CAST was opened in early 2009 she treated with him through his CAST offices.

559.    In March 2009, Dr. Durrani performed surgery on the Plaintiff consisting of a C7-T1 fusion at West Chester Hospital ["the third surgery"].

560.    Upon information and belief, Dr. Durrani used BMP-2/Infuse or Puregen "off-label" in this third surgery without Plaintiff's knowledge or consent, causing harm.

561.    Following the third surgery, Mrs. McQueary continued her treatment through Dr. Durrani and CAST.

562.    In July 2009, Dr. Durrani performed surgery on the Plaintiff consisting of an L5-S1 fusion at West Chester Hospital ["the fourth surgery"].

563.    Upon information and belief, Dr. Durrani used BMP-2/Infuse or Puregen "off-label" in this fourth surgery without Plaintiff's knowledge or consent, causing harm.

564.    During this surgery, Dr. Durrani left a drill bit inside of the Plaintiff.

565.    In December 2009, an MRI performed at Christ Hospital confirmed that Dr. Durrani had left a drill bit inside of the Plaintiff. When Plaintiff asked Dr. Durrani about this mistake, he denied it.

566. Shortly thereafter, Dr. Durrani scheduled Mrs. McQueary for a hardware revision surgery, denying that the purpose was to remove the drill bit. In fact, removing the drill bit was one of Dr. Durrani's purposes.

567. In January 2010, Dr. Durrani performed a revision surgery on the Plaintiff at West Chester Hospital ["the fifth surgery"].

568. Upon information and belief, Dr. Durrani used BMP-2/Infuse or Puregen "off-label" in this fifth surgery without Plaintiff's knowledge or consent, causing harm.

569. Following the fifth surgery, Mrs. McQueary continued her treatment with Dr, Durrani and CAST and another surgery was scheduled.

570. In August 2010, Dr. Durrani performed surgery on the Plaintiff consisting of a T1-T2 fusion at West Chester Hospital ["the sixth surgery"].

571. Upon information and belief, Dr. Durrani used BMP-2/Infuse or Puregen "off-label" in this sixth surgery without Plaintiff's knowledge or consent, causing harm.

572. Following the sixth surgery, Mrs. McQueary continued her treatment with Dr. Durrani and CAST.

573. In February 2011, Dr. Durrani performed surgery on the Plaintiff consisting of a T1-T6 discectomy and fusion at West Chester Hospital ["the seventh surgery"].

574. Upon information and belief, Dr. Durrani used BMP-2/Infuse or Puregen "off-label" in this seventh surgery without Plaintiff's knowledge or consent, causing harm.

575. Following the seventh surgery, Mrs. McQueary continued her treatment with Dr. Durrani and CAST.

576. In January 2012, Dr. Durrani performed surgery on the Plaintiff consisting of a C5-C6 fusion at Journey Lite's facility in Dayton, Ohio ["the eighth surgery"].

577.    Upon information and belief, Dr. Durrani used BMP-2/Infuse or Puregen "off-label" in this eighth surgery without Plaintiff's knowledge or consent, causing harm.

578.    Following the eighth surgery, Mrs. McQueary continued her treatment with Dr. Durrani and CAST.

579.    In August 2012, Dr. Durrani performed surgery on the Plaintiff consisting of a L5-S1 laminectomy at Journey Lite's facility in Dayton, Ohio ["the ninth surgery"].

580.    Upon information and belief, Dr. Durrani used BMP-2/Infuse or Puregen "off-label" in this ninth surgery without Plaintiff's knowledge or consent, causing harm.

581.    Following the ninth surgery, Mrs. McQueary continued her treatment with Dr. Durrani and CAST.

582.    In March 2012, Dr. Durrani performed surgery on the Plaintiff consisting of an operation on her leg at Journey Lite's facility in Cincinnati ["the tenth surgery"].

583.    Recent MRIs performed in September 2013 show that Mrs. McQueary has two new herniated discs in her T-Spine, an area that Dr. Durrani operated on extensively between 2007 and 2010.

584.    Upon information and belief, the surgery performed by Dr. Durrani was medically unnecessary and improperly performed.

**Rahman Nisbett**
**5251 Buttermilk Pike**
**Lakeside Park, KY 41017**

585.    In late 2006 and early 2007, Mr. Nisbett was experiencing constant back pain as well as radiating pain in his right leg when he was referred to Dr. Durrani at Christ Hospital.

586.    In Mr. Nisbett's first office visit with Dr. Durrani at Christ Hospital, Dr. Durrani immediately recommended surgery.

587. Dr. Durrani told Mr. Nisbett that he could "fix" him.

588. Following this office visit, Mr. Nisbett suffered from a fall while playing with his children.

589. Despite this fall, Dr. Durrani proceeded with the surgery.

590. On or about February 21, 2007 Dr. Durrani performed surgery on the Mr. Nisbett consisting of a L4-S1 fusion at Christ Hospital.

591. Dr. Durrani used Infuse/BMP-2 "off-label" in this surgery without Mr. Nisbett's knowledge or consent, causing Mr. Nisbett harm.

592. Following the surgery, Mr. Nisbett did not feel any pain relief. Over time, the pain Mr. Nisbett feels has grown worse.

593. Following the surgery, despite the ongoing pain, Dr. Durrani told Mr. Nisbett that his surgery was a "success."

594. Mr. Nisbett continues to experience pain.

595. Upon information and belief, the surgery performed by Dr. Durrani was medically unnecessary and improperly performed.

**Susan Schock**
**4351 Alverno Rd.**
**Cincinnati, OH 45238**

596. Plaintiff sought treatment with Dr. Durrani in 2007 for mild pain in her back.

597. Dr. Durrani recommended immediate surgery.

598. On or about November 11, 2008 Dr. Durrani performed a transforaminal lumbar interbody fusion on Plaintiff at Christ Hospital.

599. Immediately following surgery, Plaintiff's pain increased in severity and began radiating into her left leg.

600. Plaintiff continued to follow up with Dr. Durrani and complain to him about the increase in pain.

601. Dr. Durrani informed Plaintiff her fusion had broken and that was causing the increase in pain. He said she would need another surgery to correct the fusion.

602. In April 2010, Dr. Durrani performed revision surgery on Plaintiff at West Chester Hospital.

603. Plaintiff has suffered from constant and extreme pain since the surgeries performed by Dr. Durrani.

604. Plaintiff has been informed by another doctor that there is a broken screw in her back that requires surgical removal in the near future.

605. Plaintiff's quality of life has diminished because of the surgeries.

606. Upon information and belief, Dr. Durrani used Infuse/BMP-2 "off –label" and/or Puregen without Mrs. Schock's knowledge or consent, causing Mrs. Schock harm.

607. Upon information and belief, the surgeries performed by Dr. Durrani were medically unnecessary and improperly performed.

608. As a direct and proximate result of Mrs. Schock's surgeries, Dr. Durrani's negligence, and the Defendants' negligence, Mrs. Schock has suffered harm.

609. Plaintiff did not become aware of Infuse/BMP-2 and/or Puregen until she contacted her undersigned counsel.

**Sherrie Spangenberg**
**4493 Devon Ct.**
**Mason, OH 45040**

610. Plaintiff was referred to seek treatment with Dr. Durrani in 2006 because of severe pain in the lower right side of her back, radiating down her entire right leg. Plaintiff also suffers from scoliosis and was seeking possible treatment for this.

611. Dr. Durrani recommended spinal fusion surgery to alleviate Plaintiff's pain.

612. In January 2007, Dr. Durrani performed spinal fusion surgery on Plaintiff at Christ Hospital.

613. Plaintiff continued to follow up with Dr. Durrani following surgery.

614. Plaintiff again began to suffer from pain and discomfort and complained of this to Dr. Durrani.

615. Dr. Durrani recommended a second surgery on Plaintiff.

616. In or about November 2009, Dr. Durrani performed an AXI ALIF surgery on Plaintiff at West Chester Hospital.

617. Immediately following surgery Plaintiff began to feel intense lower back pain. She had difficulty walking and lost flexibility.

618. Dr. Durrani told her this was normal and to give it time to heal.

619. Plaintiff continued to follow up with Dr. Durrani following surgery.

620. Plaintiff continued to experience extreme lower back pain and complained to Dr Durrani of this pain.

621. Dr. Durrani recommended a third surgery for Plaintiff.

622. In or about February 2010 Dr. Durrani performed cervical fusion surgery on Plaintiff at West Chester Hospital.

623. Plaintiff continued to follow up with Dr. Durrani and continued to complain of pain and discomfort.

624. Plaintiff continues to suffer from extreme pain in her back, tailbone and legs. She has consulted with other spine doctors to repair the AXI ALIF.

625. Plaintiff is also being monitored by doctors to determine if a screw that was placed in her neck is loose or placed improperly.

626. Upon information and belief, Dr. Durrani used Infuse/BMP-2 "off-label," without Plaintiff's knowledge or consent, causing Plaintiff harm.

627. Upon information and belief, the surgeries performed by Dr. Durrani were medically unnecessary and improperly performed.

628. As a direct and proximate result of the surgeries and Dr. Durrani's actions, Plaintiff has suffered harm.

629. Plaintiff did not become aware of Dr. Durrani's use of Infuse/BMP-2 in her until she contacted her undersigned counsel.

### Billy Spivy
### 310 Rice Dr. #18
### West Union, OH 45693

630. Plaintiff sought treatment with Dr. Durrani in January 2007 because of intermittent numbness in his right leg that would cause it to go to sleep.

631. Dr. Durrani recommended lumbar surgery on the first visit.

632. On February 9, 2007 Dr. Durrani performed lumbar fusion surgery at Christ Hospital.

633. Immediately following surgery, Plaintiff began experiencing back pain and could physically feel the hardware under his skin.

634. Plaintiff complained to Dr. Durrani about the new pain and Dr. Durrani informed him the only thing that would relieve him of this would be a follow up surgery to get a disc off of a nerve in his back.

635. On March 27, 2009 Dr. Durrani performed a cervical fusion surgery on Plaintiff at Christ Hospital. Plaintiff stayed in the hospital approximately 7 days following this surgery because of complications with excessive bleeding.

636. Following this surgery, Plaintiff had an increase in back pain and began experiencing a new pain in his lower back and right leg.

637. Plaintiff continued to follow up with Dr. Durrani and complain of the pain. Dr. Durrani told him to give it a year to heal.

638. After continued pain and follow up treatment, Dr. Durrani recommended another surgery to help alleviate the pain.

639. On September 17, 2010 Dr. Durrani performed a cervical fusion on Plaintiff on the back of his neck at West Chester Hospital.

640. Plaintiff received a staph infection from this surgery and had major health complications due to this infection.

641. On February 28, 2011 Plaintiff had to undergo heart surgery and became unresponsive on the operating table. He was resuscitated.

642. The operating doctor informed Plaintiff his surgical history had affected his heart.

643. Upon information and belief, Dr. Durrani used Infuse/BMP-2 "off –label" and/or Puregen without Mr. Spivy's knowledge or consent, causing Mr. Spivy harm.

644. Upon information and belief, the surgeries performed by Dr. Durrani were medically unnecessary and improperly performed.

645.    As a direct and proximate result of Mr. Spivy's surgeries, Dr. Durrani's negligence, and the Defendant's negligence, Mr. Spivy has suffered harm.

646.    Plaintiff did not become aware of Infuse/BMP-2 and/or Puregen until he contacted his undersigned counsel.

### Connie & Joseph Underwood
### 135 Montclair Street
### Ludlow, Ky 41016

647.    Plaintiff was acquainted with Dr. Durrani as a result of his operation on her granddaughter at Cincinnati Children's Hospital Medical Center.

648.    Plaintiff first began seeing Dr. Durrani in early 2008.

649.    At the time, Plaintiff was experiencing pain in her neck and back.

650.    Dr. Durrani recommended that Plaintiff undergo surgery; first on her back and later, on her neck.

651.    On December 11, 2008 Dr. Durrani performed surgery on the Plaintiff consisting of a lumbar spinal fusion at Christ Hospital ["the first surgery"].

652.    Upon information and belief, Dr. Durrani used Infuse/BMP-2 in this first surgery without Plaintiff's knowledge or consent, causing harm.

653.    Plaintiff received follow-up care from Dr. Durrani following this first surgery.

654.    Dr. Durrani placed the Plaintiff in a full-torso brace after this surgery to assist in her recovery.

655.    Following this first surgery, Plaintiff began to suffer from severe pain in her lower back, as well as from numbness in her right leg.

656.    On February 9, 2009 Dr. Durrani performed surgery on the Plaintiff consisting of a lumbar spinal fusion at Christ Hospital ["the second surgery"].

657. Upon information and belief, Dr. Durrani used Infuse/BMP-2 or Puregen in this second surgery without Plaintiff's knowledge or consent, causing harm.

658. Plaintiff continued to receive follow-up care from Dr. Durrani at his CAST offices; however, her pain did not diminish.

659. Dr. Durrani told the Plaintiff that her back was "as good as new" in response to questions about her recovery.

660. On August 13, 2010 Dr. Durrani performed surgery on the Plaintiff consisting of a cervical spinal fusion at West Chester Hospital ["the third surgery"].

661. Upon information and belief, Dr. Durrani used Infuse/BMP-2 or Puregen in this third surgery without Plaintiff's knowledge or consent, causing harm.

662. Plaintiff continued to receive follow-up care from Dr. Durrani at his CAST offices.

663. Following this third surgery, Plaintiff suffered from severe and extreme pain.

664. Dr. Durrani told the Plaintiff to "give it time" and that her recovery would soon come.

665. On October 19, 2011 Dr. Durrani performed surgery on the Plaintiff consisting of a cervical spinal fusion at West Chester Hospital ["the fourth surgery"].

666. Upon information and belief, Dr. Durrani used Infuse/BMP-2 or Puregen in this fourth surgery without Plaintiff's knowledge or consent, causing harm.

667. Plaintiff continued to receive follow-up care from Dr. Durrani at his CAST offices until April or May of 2012.

668. Plaintiff now suffers in severe pain in her lower back, as well as from pervasive numbness that extends from her neck down to her feet.

669. Upon information and belief, the surgery performed by Dr. Durrani was medically unnecessary and improperly performed.

64

670.   As a direct and proximate result of these surgeries and Dr. Durrani's negligence, the Plaintiffs have suffered harm.

671.   Plaintiffs did not become aware of Dr. Durrani's use of Infuse/BMP-2 until legal counsel reviewed Plaintiffs' bills.

### Tracey Walsh
### 6 Hickory Lane
### Batesville, IN 47006

672.   In 2006, Plaintiff was referred to Dr. Durrani at Children's Hospital by a friend.

673.   At this time, Plaintiff was experiencing pain in her lower back and right leg.

674.   At her initial visit with Dr. Durrani, he immediately suggested that Plaintiff undergo surgery.

675.   Dr. Durrani diagnosed Plaintiff with bone spurring, despite having never examined the Plaintiff.

676.   Further, Dr. Durrani stated that he could "fix" Plaintiff with surgery and that the only limitation Plaintiff would face after surgery would be the inability to play tennis.

677.   In 2006, Dr. Durrani performed surgery on the Plaintiff consisting of a lumbar spinal fusion at West Chester Hospital ["the first surgery"].

678.   Upon information and belief, Dr. Durrani used Infuse/BMP-2 "off-label" without Plaintiff's knowledge or consent, causing harm.

679.   After the surgery, Plaintiff suffered from severe leg and back pains which were worse than the pain she experienced prior to undergoing surgery with Dr. Durrani.

680.   Plaintiff received follow-up treatment from Dr. Durrani after this surgery.

681.   On January 28, 2011, Dr. Durrani performed surgery on the Plaintiff consisting of a removal of scar tissue and bone spurs from L4-L5 at West Chester Hospital ["the second surgery"].

682.    Upon information and belief, Dr. Durrani used Infuse/BMP-2 or Puregen "off-label" in this second surgery without Plaintiff's knowledge or consent, causing harm.

683.    After this second surgery, Plaintiff continued to suffer from severe pain in her back and legs.

684.    Plaintiff continued to receive follow-up treatment from Dr. Durrani and CAST after this surgery.

685.    On February 7, 2011, Dr. Durrani performed surgery on the Plaintiff consisting of the repair of a dural tear inflicted during her second surgery at Christ Hospital ["the third surgery"].

686.    Upon information and belief, Dr. Durrani used Infuse/BMP-2 or Puregen "off-label" in this third surgery without Plaintiff's knowledge or consent, causing harm.

687.    Plaintiff continued to receive follow-up treatment with Dr. Durrani and CAST until March of 2011.

688.    Plaintiff continues to suffer from severe pain in her back and legs, as well as numbness, which injuries have directly contributed to Plaintiff's loss of employment and inability to engage in the common pursuits of her family life.

689.    Upon information and belief, the surgery performed by Dr. Durrani was medically unnecessary and improperly performed.

690.    As a direct and proximate result of these surgeries and Dr. Durrani's negligence, the Plaintiffs have suffered harm.

691.    Plaintiffs did not become aware of Dr. Durrani's use of Infuse/BMP-2 until legal counsel reviewed Plaintiffs' bills.

**Tamathy Wilder**
**234 Lewis Ln.**
**Newport, KY 41071**

692.    Ms. Wilder was experiencing right leg pain that bothered her while she was walking

when she was referred to Dr. Durrani who was working out of the Christ Hospital's Medical

Building.

693.    During her consultations with Dr. Durrani, Ms. Wilder was informed by Dr. Durrani that

she would need surgery to alleviate her pain.

694.    In late 2008, Dr. Durrani performed an anterior cervical discectomy and fusion

("ACDF") surgery at C5-6 on Ms. Wilder at Christ Hospital.

695.    Dr. Durrani subsequently performed a direct lateral interbody fusion ("DLIF") at Christ

Hospital April of 2009, a L4-L5 hemilaminectommy, foraminotomy, and decompression at West

Chester Hospital on May 17, 2012, and T8-T10 laminectomy with instrumentation at West

Chester Hospital on January 22, 2013.

696.    Upon information and belief, Dr. Durrani used Infuse/BMP-2 "off-label" or Puregen in

Ms. Wilder's surgery without Ms. Wilder's knowledge or consent, causing harm.

697.    Following the 2008 surgery, Ms. Wilder began experiencing a continuing progression of

memory loss.

698.    Following the December 2008 surgery, Ms. Wilder continued to follow up her care with

Dr. Durrani.

699.    Dr. Durrani subsequently performed the additional three surgeries on Ms. Wilder.

700.    Subsequent to the surgeries performed by Dr. Durrani, Ms. Wilder now has to have

assistance with activities of daily living, has decreased ROM, does not drive, has frequent falls,

is in severe pain, cannot lay flat in bed, and has to sleep in a chair.

701.   Prior to the surgeries, she did not have any of these issues.

702.   Upon information and belief, the surgery performed by Dr. Durrani on Ms. Wilder was medically unnecessary and/or improperly performed, causing Mr. Wilder harm.

703.   Ms. Wilder did not discover that she might have had Puregen or Infuse/BMP-2 inserted inside her body until she contacted her present counsel.

**William Wolder**
**9243 Deercross Parkway**
**Clue Ash, OH 45236**

704.   Plaintiff sought treatment with Dr. Durrani in January 2008 for pain in his shoulders, back, neck and radiating down his arms. He also was experiencing a numbness in his left arm that went into his fingers.

705.   Dr. Durrani informed Plaintiff he had two bulging dics that were putting pressure on the nerves and needed cervical fusion surgery. He also stated that if he didn't undergo this surgery he could lose the use of his arm.

706.   On or about October 30, 2008 Dr. Durrani performed a spinal fusion surgery on Plaintiff at Christ Hospital.

707.   Following surgery, Plaintiff began to have problems swallowing. Soon thereafter the pain in his neck and back returned. He began experiencing frequent stiff necks and problems moving his neck and head.

708.   Plaintiff sought treatment with Dr. Durrani following surgery to complain of the new pain and discomfort. Dr. Durrani told Plaintiff everything looked fine and to give it time.

709.   When Plaintiff continued to follow up and seek help for these issues, Dr. Durrani recommended another surgery.

710.   On April 23, 2012 Dr. Durrani performed a cervical fusion surgery on Plaintiff at West Chester Hospital.

68

711.    Plaintiff's back pain increased immediately following surgery. Plaintiff continued to seek treatment with Dr. Durrani for this pain. He continued to lose range of motion in his neck and started experiencing frequent headaches and shoulder pain.

712.    Plaintiff continues to live with constant discomfort and pain in his neck, back, arms and shoulders since the surgeries.

713.    Upon information and belief, the surgeries performed by Dr. Durrani were medically unnecessary and improperly performed.

714.    As a direct and proximate result of Mr. Wolder's surgeries, Dr. Durrani's negligence, and the Defendants' negligence, Mr. Wolder has suffered harm.

715.    Upon information and belief, Dr. Durrani used Infuse/BMP-2 "off –label" and/or Puregen without Mr. Wolder's knowledge or consent, causing Mr. Wolder harm.

716.    Plaintiff did not become aware of Infuse/BMP-2 and/or Puregen until he contacted his undersigned counsel.

### Evelyn Young
### 5211 Ponderosa Drive
### Cincinnati, OH 45239

717.    In 2008, Plaintiff's primary care physician referred Plaintiff to Dr. Durrani for back pain and had difficulty walking.

718.    At Plaintiff's initial meeting with Dr. Durrani, Dr. Durrani recommended Plaintiff undergo surgery on her back.

719.    In the winter of 2008, Dr. Durrani performed a lumbar spinal fusion on Plaintiff at Christ Hospital.

720.    Upon information and belief, during this surgery, Dr. Durrani used Infuse/BMP-2 or PureGen "off-label," without Plaintiff's knowledge or consent, causing Plaintiff harm.

721.    After this surgery, Plaintiff underwent physical and aqua therapy and treated with Dr. Durrani at Christ Hospital and later, CAST.

722.    Further, after her surgery with Dr. Durrani, Plaintiff lost flexibility and developed sharp pain in her back.

723.    Plaintiff treated with Dr. Durrani until around the spring of 2009.

724.    Currently, Plaintiff continues to have poor flexibility and excruciating back pain, which radiates down her legs.

725.    This greatly and negatively affects her daily activities.

726.    Upon information and belief, the surgeries performed by Dr. Durrani were medically unnecessary and improperly performed.

727.    As a direct and proximate result of these surgeries and Dr. Durrani's actions, Plaintiff has suffered harm.

728.    Plaintiff did not become aware of Dr. Durrani's use of Infuse/BMP-2 or Puregen until she contacted her undersigned counsel.

729.    The use of BMP-2 Infuse was off label and not proper for Plaintiff for the following reasons: posterior, wrong cage, smoker.

730.    Dr. Durrani, as an agent of the Medtronic Defendants, did not inform Plaintiff of the risks associated with using BMP-2/Infuse® in an off-label manner, nor did he obtain informed consent to such use.

### Judy & Cecil Young
### 448 Greenwell Ave.
### Cincinnati, OH 45238

731.    Plaintiff first met Dr. Durrani at Christ Hospital Medical Center in 2008.

732.    At the time, Plaintiff was experiencing pain in her neck and lower back.

733.    During consultations with Dr. Durrani, he immediately recommended that Plaintiff undergo surgery to correct her pain.

734.    Dr. Durrani assured Plaintiff that surgery would cause her pain to go away completely.

735.    On November 6, 2008 Dr. Durrani performed surgery on the Plaintiff consisting of a cervical spinal fusion with implanted hardware at Christ Hospital ["the first surgery"].

736.    Upon information and belief, Dr. Durrani used Infuse/BMP-2 "off-label" in this surgery without Plaintiff's knowledge or consent, causing harm.

737.    Plaintiff received follow-up care from Dr. Durrani at Christ Hospital; during this treatment he recommended that Plaintiff undergo surgery on her lower back.

738.    However, Plaintiff was still suffering from pain in her neck following the first surgery.

739.    On September 25, 2009 Dr. Durrani performed surgery on the Plaintiff consisting of a lumbar spinal fusion with the installation of hardware at West Chester Hospital ["the second surgery"].

740.    Upon information and belief, Dr. Durrani used Infuse/BMP-2 or Puregen "off-label" in this second surgery without Plaintiff's knowledge or consent, causing harm.

741.    Plaintiff continued to receive postoperative treatment with Dr. Durrani, this time through his CAST offices in Blue Ash.

742.    Plaintiff continued to suffer from lower back pain after this surgery, and has been forced to deal with constant discomfort and pain from her implanted hardware.

743.    Upon information and belief, the surgeries performed by Dr. Durrani were medically unnecessary and improperly performed.

744.    As a direct and proximate result of these surgeries and Dr. Durrani's negligence, the Plaintiffs have suffered harm.

71

745.     Plaintiffs did not become aware of Dr. Durrani's use of Infuse/BMP-2 until legal counsel reviewed Plaintiffs' bills.

## DR. DURRANI COUNTS:

## COUNT I: NEGLIGENCE

746.     Defendant Dr. Durrani owed his patients, Plaintiffs, the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

747.     Defendant Dr. Durrani breached his duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiffs, including but not limited to improper selection for surgery, improper performance of the surgery, and improper follow-up care addressing a patients' concerns.

748.     As a direct and proximate result of the aforementioned negligence and deviation from the standard of care on the part of the Defendant Dr. Durrani, Plaintiffs sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of ability to perform usual and customary activities and incurred substantial medical expenses and treatment.

## COUNT II: BATTERY

749.     Dr. Durrani committed battery against Plaintiffs by performing a surgery that was unnecessary, contraindicated for Plaintiffs' medical condition, and for which he did not properly obtain informed consent, inter alia, by using BMP-2, PureGen and/or Baxano in ways and for

surgeries not approved by the FDA and medical community, and by the failure to provide this information to Plaintiffs.

750.    Plaintiffs would not have agreed to the surgery if he knew the surgery was unnecessary, not approved by the FDA, and not indicated.

751.    As a direct and proximate result of the aforementioned battery by Dr. Durrani, Plaintiffs sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, loss of the ability to perform usual and customary activities, and incurred substantial medical expenses and treatment.

## COUNT III: LACK OF INFORMED CONSENT

752.    The informed consent forms from Dr. Durrani Plaintiffs were required to sign, failed to fully cover all the information necessary and required for the procedures and surgical procedures performed by Dr. Durrani.  Dr. Durrani required an informed consent release.

753.    In addition, no one verbally informed Plaintiffs of the information and risks required for informed consent at the time of or before the Plaintiffs' surgery.

754.    Dr. Durrani failed to inform Plaintiffs of material risks and dangers inherent or potentially involved with his surgery and procedures.

755.    Plaintiffs subsequently developed severe and grievous injuries as a direct and proximate result of lack of informed consent.

756.    Had Plaintiffs been appropriately informed of the need or lack of need for surgery and other procedures and the risks of the procedures, Plaintiffs would not have undergone the surgery or procedures.

## COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

757.    Dr. Durrani's conduct as described above was intentional and reckless.

758.    It is outrageous and offends against the generally accepted standards of morality.

759.    It was the proximate and actual cause of Plaintiffs' psychological injuries, emotional injuries, mental anguish, suffering, and distress.

760.    Plaintiffs suffered severe distress and anguish so serious and of a nature that no reasonable man or woman would be expected to endure.

## COUNT V: FRAUD

761.    Dr. Durrani made material, false representations to Plaintiffs and his insurance company related to Plaintiffs' treatment including: stating the surgery was necessary, that Dr. Durrani "could fix" Plaintiffs, that more conservative treatment was unnecessary and futile, that the surgery would be simple or was "no big deal", that Plaintiffs would be walking normally within days after each surgery, that the procedures were medically necessary and accurately reported on the billing to the insurance company, that the surgery was successful, and that Plaintiffs were medically stable and ready to be discharged.

762.    Dr. Durrani also concealed the potential use of Infuse/BMP-2 and/or Puregen in Plaintiffs' surgery when he had a duty to disclose to Plaintiffs his planned use of the same.

763.    These misrepresentations and/or concealments were material to Plaintiffs because they directly induced the Plaintiffs to undergo his surgery.

764.    Dr. Durrani knew or should have known such representations were false, and/or made the misrepresentations with utter disregard and recklessness as to their truth that knowledge of their falsity may be inferred.

765.    Dr. Durrani made the misrepresentations both before, during and after the surgery with the intent of misleading Plaintiffs and his insurance company into relying upon them. Specifically, the misrepresentations were made to induce payment by the insurance company,

74

without which Dr. Durrani would not have performed the surgery, and to induce Plaintiffs to undergo the surgery without regard to medical necessity and only for the purpose of receiving payment.

766. The misrepresentations and/or concealments were made during the Plaintiffs' office visits at Dr. Durrani's CAST offices and/or at Children's Hospital.

767. Plaintiffs were justified in relying on the misrepresentations because a patient has a right to trust his or her doctor and that the facility is overseeing the doctor to ensure the patients of that doctor can trust the facility.

768. As a direct and proximate result of the aforementioned fraud, Plaintiffs did undergo surgery, which was paid for in whole or in part by his insurance company, and suffered severe and grievous injuries, paralysis, new and different pain, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, loss of ability to perform usual and customary activities, and incurred substantial medical expenses and treatment.

## COUNT VI: SPOLIATION OF EVIDENCE

769. Dr. Durrani willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiffs' records, billing records, paperwork and related evidence.

770. Dr. Durrani spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

771. Dr. Durrani's conduct was designed to disrupt Plaintiffs' potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiffs.

## CHILDREN'S HOSPITAL COUNTS:

### COUNT I: VICARIOUS LIABILITY

772.    At all times relevant, Defendant Dr. Durrani was an agent, and/or employee of Children's Hospital through December 2008.

773.    Defendant Dr. Durrani was performing within the scope of his employment with Children's Hospital during the care and treatment of Plaintiffs.

774.    Defendant Children's Hospital is responsible for harm caused by acts of its employees for conduct that was within the scope of employment under the theory of respondeat superior.

775.    Defendant Children's Hospital is vicariously liable for the acts of Defendant Dr. Durrani alleged in this Complaint including all of the counts asserted against Dr. Durrani directly.

776.    As a direct and proximate result of Defendant Children's Hospital's acts and omissions, Plaintiffs sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of ability to perform usual and customary activities and incurred substantial medical expenses and treatment.

### COUNT II: NEGLIGENT HIRING, SUPERVISION, CREDENTIALING & RETENTION

777.    As described in the Counts asserted directly against Dr. Durrani, the actions of Dr. Durrani with respect to Plaintiffs constitute physician negligence and medical malpractice.

778.    Children's Hospital negligently credentialed, hired and retained Dr. Durrani as a credentialed physician by:

        a.    Allowing Dr. Durrani to repeatedly violate the Children's Hospital bylaws with it's full knowledge of the same;

    b.      Failing to adequately review, look into, and otherwise investigate Dr. Durrani's educational background, work history and peer reviews when he applied for privileges and employment at Children's Hospital;

    c.      Ignoring complaints about Dr. Durrani's treatment of patients reported to it by Children's Hospital staff, Dr. Durrani's patients and by others;

    d.      Failing to properly supervise Dr. Durrani's treatment of patients.

779.    The Safe Medical Device Act required entities such as Children's Hospital to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

780.    Such disregard for and violations of federal law represents strong evidence that Children's Hospital negligently granted and retained privileges for Dr. Durrani.

781.    Children's Hospital further breached its duty to Plaintiffs, inter alia, by not controlling the actions of Dr. Durrani and the doctors, nurses, staff, and those with privileges, during the medical treatment of Plaintiffs at Children's Hospital.

782.    As a direct and proximate result of the negligent credentialing and retention of Dr. Durrani, Plaintiffs sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of ability to perform usual and customary activities and incurred substantial medical expenses and treatment that Plaintiffs would not otherwise have incurred had Dr. Durrani not been credentialed by Children's Hospital.

## COUNT III: SPOLIATION OF EVIDENCE

783.    Children's Hospital through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiffs' records, billing records, paperwork and related evidence.

784.     Children's Hospital through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiffs.

785.     Children's Hospital's conduct was designed to disrupt Plaintiffs' potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## COUNT IV: FRAUD

786.     Children's Hospital sent out billing to Plaintiffs at their home following his surgery at Children's Hospital.

787.     The exact dates these medical bills were sent out are reflected in those medical bills.

788.     These bills constituted affirmative representations by Children's Hospital that the charges related to Plaintiffs' surgery were medically appropriate and properly documented.

789.     The bills were sent with the knowledge of Children's Hospital that in fact Plaintiffs' surgery was not appropriately billed and documented and that the service rendered at Children's Hospital associated with Dr. Durrani was not appropriate.

790.     The bills sent by Children's Hospital to Plaintiffs' falsely represented that Plaintiff's surgery was appropriately indicated, performed and medically necessary in contra-indication of the standard of care.

791.     Plaintiffs relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiffs for Children's Hospital's services in association with Dr. Durrani's surgery.

792.     As a direct and proximate result of this reliance on the billing of Children's Hospital, Plaintiff incurred medical bills that he otherwise would not have incurred.

793.    Children's Hospital also either concealed from Plaintiff that Infuse/BMP-2 or Puregen would be used in Plaintiffs' surgery, or misrepresented to Plaintiffs the nature and necessity of the surgery and the particular risks involved therein.

794.    Children's Hospital's concealments and misrepresentations regarding Infuse/BMP-2 or Puregen and the nature, necessity, and risks of Plaintiff's surgery were material facts.

795.    Because of its superior position and professional role as a medical service provider, Children's Hospital had a duty to disclose these material facts to Plaintiffs and a duty to refrain from misrepresenting such material facts to Plaintiffs.

796.    Children's Hospital intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiffs to undergo the surgery, and thereby profited from the surgeries and procedures Dr. Durrani performed on Plaintiff at Children's Hospital.

797.    Plaintiffs were unaware that Infuse/BMP-2 or Puregen would be used in Plaintiffs' surgery and therefore, was unaware of the health risks of Infuse/BMP-2 or Puregen's use in Plaintiffs' spine.

798.    Had Plaintiffs known before Plaintiffs' surgery that Infuse/BMP-2 or Puregen would be used in Plaintiffs' spine and informed of the specific, harmful risks flowing therefrom, Plaintiffs would not have undergone the surgery with Dr. Durrani at Children's Hospital.

799.    As a direct and proximate result of Children's Hospital's concealments and/or misrepresentations regarding Infuse/BMP-2 or Puregen, and the nature and necessity of the surgery performed by Dr. Durrani at Children's Hospital, Plaintiffs sustained, inter alia, economic, and non-economic (including physical, emotional) damages.

## CHRIST HOSPITAL COUNTS:

### COUNT I: NEGLIGENCE

800.    Christ Hospital owed his patient, Plaintiffs, through its agents and employees the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

801.    Christ Hospital acting through its agents and employees breached his duty by failing to exercise the requisite degree of skill, care, and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiffs, including but not limited to improper selection for surgery, improper performance of the surgery, improper assistance during Plaintiff's surgeries and improper follow up care addressing a patient's concerns.

802.    The agents and employees who deviated from the standard of care include nurses, physician assistants, residents and other hospital personnel who participated in Plaintiff's surgeries.

803.    The management, employees, nurses, technicians, agents and all staff during the scope of their employment and/or agency of Christ Hospital's knowledge and approval, either knew or should have known the surgery was not medically necessary based upon Dr. Durrani's known practices; the pre-op radiology; the pre-op evaluation and assessment; and the violation of their responsibility under the bylaws, rules, regulations and policies of Christ Hospital.

804.    As a direct and proximate result of the aforementioned negligence and deviation from the standard of care by the agents and employees of Christ Hospital, Plaintiff sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort,

loss of enjoyment of life, and loss of ability to perform usual and customary activities and incurred substantial medical expenses and treatment.

### COUNT II: NEGLIGENT CREDENTIALING, SUPERVISION & RETENTION

805.    As described in the Counts asserted directly against Dr. Durrani, the actions of Dr. Durrani with respect to Plaintiffs constitute physician negligence and medical malpractice.

806.    Christ Hospital negligently credentialed and retained Dr. Durrani as a credentialed physician by:

>    a.    Allowing Dr. Durrani to repeatedly violate Christ Hospital's bylaws with its full knowledge of the same;

>    b.    Failing to adequately review, look into, and otherwise investigate Dr. Durrani's educational background, work history and peer reviews when he applied for privileges at Christ Hospital;

>    c.    Ignoring complaints about Dr. Durrani's treatment of patients reported to it by Christ Hospital staff, Dr. Durrani's patients and by others;

>    d.    Ignoring Dr. Durrani's previous privilege terminations from other Cincinnati area hospitals, including Children's Hospital, Deaconess Hospital, Good Samaritan Hospital and Christ Hospital.

807.    The Safe Medical Device Act required entities such as Christ Hospital to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

808.    Such disregard for and violations of federal law represents strong evidence that Christ Hospital negligently granted and retained privileges for Dr. Durrani.

809.    As a direct and proximate result of the negligent credentialing and retention of Dr. Durrani, Plaintiffs sustained severe and grievous injuries, prolonged pain and suffering,

emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of ability to perform usual and customary activities and incurred substantial medical expenses and treatment that Plaintiffs would not otherwise have incurred had Dr. Durrani not been credentialed by Christ Hospital.

## COUNT III: FRAUD

810. Christ Hospital sent out billing to Plaintiffs at their home following their surgeries at Christ Hospital.

811. The exact dates these medical bills were sent out are reflected in those medical bills.

812. These bills constituted affirmative representations by Christ Hospital that the charges related to Plaintiff's surgery were medically appropriate and properly documented.

813. The bills were sent with the knowledge of Christ Hospital that in fact Plaintiff's surgery was not appropriately billed and documented and that the service rendered at Christ Hospital associated with Dr. Durrani was not appropriate.

814. The bills sent by Christ Hospital to Plaintiff's falsely represented that Plaintiff's surgery was appropriately indicated, performed and medically necessary in contra-indication of the standard of care.

815. Plaintiffs are still awaiting billing from Christ Hospital reflecting the exact totals charged for the use of BMP-2 in Plaintiffs surgeries.

816. Plaintiffs relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiffs for Christ Hospital's services in association with Dr. Durrani's surgeries.

817. As a direct and proximate result of this reliance on the billing of Christ Hospital, Plaintiffs incurred medical bills that they otherwise would not have incurred.

818.     Christ Hospital also either concealed from Plaintiffs that Infuse/BMP-2 would be used in Plaintiff's surgery, or misrepresented to Plaintiffs the nature of the surgery and the particular risks that were involved therein.

819.     Christ Hospital's concealments and misrepresentations regarding Infuse/BMP-2 and the nature and risks of Plaintiff's surgeries were material facts.

820.     Because of its superior position and professional role as a medical service provider, Christ Hospital had a duty to disclose these material facts to Plaintiffs and a duty to refrain from misrepresenting such material facts to Plaintiffs.

821.     Christ Hospital intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiffs in order to induce Plaintiffs to undergo the surgery, and thereby profited from the surgeries and procedures Dr. Durrani performed on Plaintiffs at Christ Hospital.

822.     Plaintiffs was unaware that Infuse/BMP-2 would be used in Plaintiff's surgeries and therefore, was unaware of the health risks of Infuse/BMP-2's use in Plaintiff's spine.

823.     Had Plaintiffs known before Plaintiff's surgeries that Infuse/BMP-2 would be used in Plaintiff's spine and informed of the specific, harmful risks flowing therefrom, Plaintiffs would not have undergone the surgeries with Dr. Durrani at Christ Hospital.

824.     The use of BMP-2 increases a person's chance of cancer by 3.5%

825.     Due to the unnecessary surgeries Dr. Durrani performed, Plaintiffs has a 3.5% increased chance of cancer because of the use of BMP-2.

826.     As a direct and proximate result of the use and implementation of Infuse/BMP-2 Plaintiffs has incurred a 3.5% increase in the risk of Cancer. As a result, Plaintiffs has an increased fear of Cancer.

83

827.     As a direct and proximate result of Christ Hospital's concealments and/or

misrepresentations regarding Infuse/BMP-2, and the nature of the surgeries performed by Dr.

Durrani at Christ Hospital, Plaintiffs sustained, inter alia, economic, and non-economic

(including physical, emotional) damages.

## COUNT IV: SPOLIATION OF EVIDENCE

828.     Christ Hospital through its agents and employees, willfully altered, destroyed, delayed,

hid, modified and/or spoiled ("spoiled") Plaintiff's records, billing records, paperwork and

related evidence.

829.     Christ Hospital through its agents and employees, spoiled evidence with knowledge that

there was pending or probable litigation involving Plaintiffs.

830.     Christ Hospital's conduct was designed to disrupt Plaintiff's potential and/or actual case,

and did in fact and proximately cause disruption, damages and harm to Plaintiffs.

## COUNT V: OHIO CONSUMER SALES PROTECTION ACT

831.     Although the Ohio Consumer Sales Protection Statutes O.R.C 1345.01 et seq. exempts

physicians, a transaction between a hospital and a patient/consumer is not clearly exempted.

832.     Christ Hospital's services rendered to Plaintiffs constitute a "consumer transaction" as

defined in ORC Section 1345.01(A).

833.     Christ Hospital omitted suppressed and concealed from Plaintiffs facts with the intent

that Plaintiffs rely on these omissions, suppressions, and concealments as set forth herein.

834.     Christ Hospital's misrepresentations, and its omissions, suppressions and concealments

of fact, as described above, constituted unfair, deceptive and unconscionable acts and practices in

violation of O.R.C 1345.02 and 1345.03 and to Substantive Rules and case law.

835.     Christ Hospital was fully aware of its actions.

84

836.     Christ Hospital was fully aware that Plaintiffs was induced by and relied upon Christ Hospital's representations at the time Christ Hospital was engaged by Plaintiffs.

837.     Had Plaintiffs been aware that Christ Hospital's representations as set forth above were untrue, Plaintiffs would not have used the services of Defendants.

838.     Christ Hospital, through its agency and employees knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

839.     Christ Hospital's actions were not the result of any bona fide errors.

840.     As a result of Christ Hospital's unfair, deceptive and unconscionable acts and practices, Plaintiffs has suffered and continues to suffer damages, which include, but are not limited to the following:

      a.    Loss of money paid

      b.    Severe aggravation and inconveniences

      c.    Under O.R.C. 1345.01 Plaintiff is entitled to:

          i.    An order requiring Christ Hospital restore to Plaintiff all money received from Plaintiff plus three times actual damages and/or actual/statutory damages for each violation;

          ii.    All incidental and consequential damages incurred by Plaintiff;

          iii.    All reasonable attorneys' fees, witness fees, court costs and other fees incurred;

## COUNT VI: PRODUCTS LIABILITY

841.     At all times Infuse/BMP-2 is and was a product as defined in R.C. § 2307.71(A)(12) and applicable law.

842.    Defendant (aka supplier) supplied Medtronic's (aka manufacturer) Infuse/BMP-2 for surgery performed by Dr. Durrani on Plaintiffs.

843.    Defendant, as a supplier, failed to maintain Infuse/BMP-2 properly.

844.    Defendant did not adequately supply all components required to use Infuse/BMP-2 properly.

845.    Defendant knew or should have known the FDA requirements and Medtronic's requirements for using Infuse/BMP-2.

846.    Defendant stored Infuse/BMP-2 at its facility.

847.    Defendant ordered Infuse/BMP-2 for surgery performed by Dr. Durrani.

848.    Defendant did not adequately warn Plaintiffs that Infuse/BMP-2 would be used without all FDA and manufacturer required components.

849.    Defendant did not gain informed consent from Plaintiffs for the use of Infuse/BMP-2, let alone warn of the supplying of the product without FDA and manufacturer requirements.

850.    Defendant failed to supply Infuse/BMP-2 (aka product) in the manner in which it was represented.

851.    Defendant failed to provide any warning or instruction in regard to Infuse/BMP-2, and failed to make sure any other party gave such warning or instruction.

852.    Plaintiffs suffered physical, financial, and emotional harm due to Defendant's violation of the Ohio Products Liability act. Plaintiff's injuries were a foreseeable risk

853.    Plaintiffs did not alter, modify or change the product, nor did Plaintiffs know that the product was being implanted without all required components.

854.    Defendant knew or should have known that the product was extremely dangerous and should have exercised care to provide a warning that the product was being used and that the

product was being used outside FDA and manufacturer requirements. The harm caused to Plaintiffs by not providing an adequate warning was foreseeable,

855. Defendant knew that the product did not conform to the representation of the intended use by the manufacturer yet permitted the product to be implanted into Plaintiffs.

856. Defendant, as a supplier, acted in an unconscionable manner in failing to supply the product without all FDA and manufacturer required components.

857. Defendant, as a supplier, acted in an unconscionable manner in failing to warn Plaintiffs that the product was being supplied without all FDA and manufacturer required components.

858. Defendant's actions demonstrate they took advantage of the Plaintiffs inability, due to ignorance of the product, to understand the product being implanted without FDA and manufacturer required components.

859. Defendant substantially benefited financially by the use of the product as the product allowed for Defendant to charge more for the surgery.

860. Plaintiff suffered economic loss as defined in R.C. § 2303.71(A)(2) and applicable law.

861. Plaintiff suffered mental and physical harm due to Defendant's acts and omissions.

862. Plaintiff suffered emotional distress due to acts and omissions of Defendant and is entitled to recovery as defined in R.C. § 2307.71(A)(7) and applicable law.

863. Defendant violated the Ohio Products Liability Act R.C. § 2307.71-2307.80

864. Defendant violated R.C. § 2307.71(A)(6)

865. Defendant violated The Ohio Consumer Sales Practices Act R.C. § 1345.02-.03.

866. Defendant provided inadequate warnings are defined in R.C, § 2307.76(A) and applicable law.

## PRAYER FOR RELIEF (JURY DEMAND)

**WHEREFORE,** Plaintiff requests and seeks justice, against Defendants, in the form and procedure of a jury, verdict and judgment against Defendants on all claims for the following damages:

1.    Past medical bills;

2.    Future medical bills;

3.    Lost income and benefits;

4.    Lost future income and benefits;

5.    Loss of ability to earn income;

6.    Past pain and suffering;

7.    Future pain and suffering;

8.    Plaintiff seeks a finding that their injuries are catastrophic under Ohio Rev. Code §2315.18;

9.    Plaintiff seeks all relief available under the Ohio Products Liability Act R.C. § 2307.71-2307.80 and applicable law;

10.    All incidental costs and expenses incurred as a result of their injuries;

11.    The damages to their credit as a result of their injuries;

12.    Punitive damages;

13.    Compensatory;

14.    Costs;

15.    Attorneys' fees;

16.    Interest;

17.    All property loss;

88

18.    All other relief to which they are entitled including O.R.C. 1345.01

19.    Based upon 1-18 itemization of damages, the damages sought exceed the minimum

jurisdictional amount of this Court and Plaintiff seeks in excess of $25,000.

Respectfully Submitted,

Matthew Hammer (0092483)
Lindsay Boese (0091307)
*Attorneys for Plaintiffs*
5247 Madison Pike
Independence, KY 41051
Phone: 513-729-1999
Fax: 513-381-4084
mhammer@ericdeters.com

## JURY DEMAND

Plaintiffs make a demand for a jury under all claims.

Matthew Hammer (0092483)
Lindsay Boese (0091307)

89



## COMMON PLEAS COURT
## HAMILTON COUNTY, OHIO

Gayle Bachman, et al.

CASE NO. _____ A 1 6 0 1 2 3 7 _____

**VS**

Cincinnati Children's Hospital Medical Center, et al.

**WRITTEN REQUEST FOR SERVICE**
**TYPE OF PAPERS TO BE SERVED ARE**

Complaint And Jury Demand

( ʙ) **PLEASE CHECK IF THIS IS A**
**DOMESTIC CASE**

**PLAINTIFF/DEFENDANT REQUESTS:**

**CERTIFIED MAIL SERVICE** X

**PERSONAL SERVICE** _____

**PROCESS SERVICE** _____

**EXPRESS MAIL SERVICE** _____

**REGULAR MAIL SERVICE** _____

**RESIDENCE SERVICE** _____

**FOREIGN SHERIFF** _____

ON Frank C. Woodside, III, 1900 Chemed Center, 255 E. Fifth Street, Cincinnati, Ohio 45202

The Christ Hospital, Inc. Serve: CT Corporation System 1300 East Ninth Street

Cleveland, Ohio 44114

REGULAR MAIL WAIVER

REGULAR MAIL WAIVER

## Matthew J. Hammer

**ATTORNEY**

5247 Madison Pike Independence, KY 41051

**ADDRESS**

859-363-1900

**PHONE NUMBER**

0092483

**ATTORNEY NUMBER**

## COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

REQUEST AND INSTRUCTIONS FOR ORDINARY MAIL SERVICE

Gayle Bachman, et al.
_____
**Plaintiff**

-vs-

Cincinnati Children's Hospital Medical Center, et al.
_____
**Defendant**

INSTRUCTIONS TO THE CLERK

CASE NUMBER: ___A 1 6 0 1 2 3 7___

IF SERVICE OF PROCESS BY CERTIFIED MAIL IS RETURNED BY THE POSTAL
AUTHORITIES WITH AN ENDORSEMENT OF "REFUSED" OR "UNCLAIMED" AND IF THE
CERTIFICATE OF MAILING CAN BE DEEMED COMPLETE NOT LESS THAN FIVE (5) DAYS
BEFORE ANY SCHEDULED HEARING, THE UNDERSIGNED WAIVES NOTICE OF THE
FAILURE OF SERVICE BY THE CLERK AND REQUESTS ORDINARY MAIL SERVICE IN
ACCORDANCE WITH CIVIL RULE 4.6 (C) OR (D) AND CIVIL RULE 4.6 (E).

Matthew J. Hammer
_____
**ATTORNEY OF RECORD**          **(TYPE OR PRINT)**

03/01/2016
_____
**DATE**

\s\Matthew J. Hammer
_____
**ATTORNEY'S SIGNATURE**

FILED

2016 MAR -1 P 2:19

TRACY WINKLER
CLERK OF COURTS
HAMILTON COUNTY, OH